# Commonwealth *vs.* Hector Arriaga
## (and a companion case[1]).

Hampden. May 10, 2002. - January 27, 2003.

Present: Marshall, C.J., Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Jury and Jurors. Constitutional Law,* Fair trial, Jury, Assistance of counsel. *Practice, Criminal,* Jury and jurors, Challenge to jurors, Postconviction relief, Request for fees and costs, Discovery, Instructions to jury, Agreement between prosecutor and witness, Assistance of counsel, Capital case. *Malice. Homicide. Accessory and Principal. Evidence,* Redirect examination, Prior inconsistent statement.

This court applied the "absolute disparity" test to the claim of criminal defendants in a murder case that their jury trial venire unconstitutionally underrepresented Hispanic citizens, and concluded that the defendants had not demonstrated a significant disparity between Hispanics and other persons serving as jurors, and thus had not met their burden of making a prima facie case of jury underrepesentation; further, the court concluded that the judge did not abuse her discretion in denying the defendants' motions to dismiss the venire and for a new trial, and also concluded that the composition of the jury that convicted the defendants did not give rise to a substantial likelihood of a miscarriage of justice. [561-568]

There was no abuse of discretion or error of law in a judge's denial of a post-trial motion for approval of costs and expenses under G. L. c. 261, § 27C, to retain a statistician and Hispanic linguist aimed at gathering information to present challenges to the process of selecting jurors for the Hampden County grand jury and the Essex County trial jury. [569]

There was no abuse of discretion in a judge's denying discovery under Mass. R. Crim. P. 30 (c) (4), 378 Mass. 900 (1979), in a criminal case as to the composition of the Hampden County grand jury that indicted the defendants and the Essex County petit jury that tried them; further, absent a conclusion by the judge that the defendants' motion and affidavits raised a substantial issue that would require an evidentiary hearing, the judge did not abuse her discretion in not affording the defendants such a hearing. [569-571]

This court, having instructed the jury commissioner, as soon as practicable, to require the disclosure of the racial and ethnic background of potential jurors on the juror confirmation form, which should be modeled after the juror qualification form used in the Federal courts, nevertheless stated that the current gap in the court's own gathering of information did not relieve criminal defendants of their burden of proving a prima facie case that their

[1]Commonwealth *vs.* Alex Delgado.

right to a trial before a jury representing a fair cross section of the community had been violated. [571-572]

At a murder trial, the judge's instructions to the jury that contained both an obsolete definition of malice and the current three prong definition adequately conveyed the meaning of malice to the jury. [573]

At a murder trial in which the judge instructed the jury on the factors delineated in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), but did not indicate to the jury the necessity of finding one or more of those factors in order to find extreme atrocity or cruelty, there was no substantial likelihood of a miscarriage of justice, where the defendants were tried before this court's decision in *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994), in which it was stated that the Commonwealth was required to prove one of the *Cunneen* factors. [573-574]

At a murder trial, the judge erred in her instructions to the jury on murder in the first degree on the theory of premeditation and deliberation by failing to instruct that the jury must find the first prong of malice, namely, an intent to kill; however, the erroneous instructions did not create a substantial likelihood of a miscarriage of justice, where, read in their entirety, the instructions conveyed to the jury the requirements for a conviction of premeditated murder; where there was no doubt that the jury found the defendant had the specific intent to kill; and where, since the jury also returned a conviction of murder in the first degree based on the theory of extreme atrocity or cruelty, the defendant was not likely to have been prejudiced. [574]

At a murder trial, the judge did not err in her instructions to the jury that, in addition to delineating the factors articulated in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), indifference or pleasure in pain is cruelty. [574-575]

At a murder trial, the judge did not err in her instructions to the jury with respect to the theory of accessory to murder in the first degree with premeditation. [575]

At a murder trial, the judge's instructions to the jury as to accessory before the fact were sufficient to indicate to the jury that their findings would have to be specific and individual to the defendant to find him guilty as an accessory before the fact to the victim's murder. [575]

At a murder trial, the judge did not err in permitting the Commonwealth to elicit on redirect examination testimony of a companion of the defendant that the companion was selling drugs, which, the defendant claimed, showed guilt by association and was more prejudicial than probative, where the defendant had opened the door to this information while trying to establish that his companion had an independent motive to kill the victim, and the Commonwealth was entitled to address the issue on redirect examination to rehabilitate its witness. [576-577]

A defendant at a murder trial was not, in the circumstances, deprived of due process by his companion's agreement with the Commonwealth for "truthful" testimony. [577-579]

At a murder trial, the judge did not err in allowing the prosecution to rehabilitate a witness with his prior consistent statement, which suggested that the defendant was involved in the illegal activities of a certain group, where the judge gave appropriate limiting and curative instructions regarding the testimony. [579-580]

There was no merit to the contention of a criminal defendant that he was

deprived of his rights by the Commonwealth's failure to disclose the elements of its agreement with a witness. [580-581]

At a murder trial, there was no substantial likelihood of a miscarriage of justice created by defense counsel's conceding both in his opening and closing statements that the defendant was guilty of murder in the second degree, where it could not be stated that counsel's tactics were manifestly unreasonable, and where counsel did not abandon his role as advocate by arguing for mitigation to murder in the second degree; nor was it demonstrated that the respective counsel of the defendants rendered ineffective assistance in failing to preserve error and to pursue and develop motions to dismiss the jury venire. [581-583]

INDICTMENTS found and returned in the Superior Court Department on October 2, 1992, and January 19, 1993, respectively.

The cases were tried before *Constance M. Sweeney*, J., and posttrial motions were heard by her.

*John M. Thompson* for Alex Delgado.

*Charles K. Stephenson* for Hector Arriaga.

*Thomas H. Townsend*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant Hector Arriaga was convicted of murder in the first degree based on deliberate premeditation and extreme atrocity or cruelty. His codefendant, Alex Delgado, was convicted of being an accessory before the fact to that murder. The defendants filed several posttrial motions, including motions for a new trial. They have appealed from the denial of these motions. On appeal, the defendants also raise a number of issues that they argue entitle them to a new trial: the trial judge's instructions to the jury; the improper admission of witness testimony; and the ineffective assistance of their respective trial counsel. The defendants' primary claim of error, however, is that the jury trial venire unconstitutionally underrepresented Hispanic citizens. Applying the "absolute disparity" test, we conclude that the defendants have not demonstrated a significant disparity between Hispanics and other persons serving as jurors. They have also failed to demonstrate that any disparity resulted from the systematic exclusion of Hispanic citizens in the jury selection. In reaching our conclusions we note the difficulties defendants face in obtaining evidence of underrepresentation. We recognize that obtaining reliable, statistically valid informa-

tion concerning the race and ethnicity of persons summonsed to jury duty may be difficult. At the present time, the jury commissioner calls for the voluntary disclosure of racial background information from potential jurors. The United States government, on the other hand, requires that potential jurors in Federal courts must disclose information concerning their race. See 28 U.S.C. § 1869(h) (2000). Pursuant to our supervisory powers under G. L. c. 234A, § 5, we direct the commissioner to amend the juror confirmation forms as soon as practicable to require the submission of such information. Our change in the gathering of juror racial background information, however, has no impact on the present case. Because their claims lack merit, and because our review of the record under G. L. c. 278, § 33E, reveals no reason that justice would require our intervention, we affirm the defendants' convictions and the denials of their posttrial motions.

I. *Facts.*

We recite the facts in the light most favorable to the Commonwealth. The victim (Arnaldo Esteras), Carlos Rodriguez, and Carlos Cruz were standing on the corner of Main and Sheldon Streets in Springfield on the early afternoon of September 13, 1992, when Ismael Cintron walked by on his way to a grocery store. Cintron was wearing his "Latin Kings" beads and the victim told him to "[t]ake off the mother fucking beads or tuck them in your jacket." Rodriguez threatened to give Cintron an "ass whipping" if he did not remove the beads. When Cintron emerged from the market his beads were no longer visible.

Cintron viewed the insult to his beads as publicly humiliating and requiring retaliation to "regain respect" on the street. He went to the local Latin Kings headquarters and "reported the incident." Members of the gang (including Delgado, the vice-president) decided that, in response, Esteras should be "terminated." They armed Cintron with a gun and Arriaga with a folding knife, and dispatched them on their "mission," clad in dark hooded sweatshirts. As they approached Esteras, still in the company of friends on Main Street, Cintron decided he could not shoot the victim. Arriaga took the gun from him and gave him the knife.

At approximately 9:15 P.M., Arriaga shot Esteras in the chest from a distance of about four feet. Esteras, who had been sitting on the hood of a car, rolled off and began to run, but tripped and fell. Arriaga pursued him, still firing. The victim suffered two gunshot wounds to the head and one to his chest; he died in the emergency room of a Springfield hospital at about 9:30 P.M.

As Cintron and Arriaga returned to the getaway car, Arriaga handed the gun back to Cintron. Cintron emptied the spent shells and wiped the gun clean of fingerprints while Cruz Gonzalez, the driver, headed toward Connecticut. In Hartford, Arriaga and Cintron cleaned any fingerprints from the car and removed a stolen registration plate that they discarded with their hooded sweatshirts. They buried the gun in a Hartford park.

Shortly after the shooting, Sergeant Kevin Devine of the Springfield police department interviewed several witnesses. He took them to the detective bureau and showed them mugshots to see if they could identify "Quest" (Cintron's street name). When Cintron was identified in the early hours of September 14, the police set out for three locations, including the Latin Kings headquarters (an apartment at 95 Bancroft Street), where they found a black jacket bearing the name "Quest" and Arriaga's wallet.

Within several hours of their return to Springfield both Gonzalez and Cintron were arrested. Delgado was taken into custody by Amherst police on September 14. On September 15, Gonzalez accompanied Springfield police to Hartford and assisted in the recovery of the stolen registration plate, the sweatshirts, and the gun. Delgado's fingerprint was found on the registration plate. Arriaga voluntarily surrendered to police on September 25 and was interrogated by Sergeant Devine. He initially denied any involvement in the victim's death or any affiliation with the Latin Kings. After Devine read from statements obtained from Cintron and Gonzalez, Arriaga admitted that he had lied. He then described what he characterized as his and Cintron's attempted robbery of the victim to obtain marijuana. When gunfire erupted, he ran from the scene and persuaded Gonzalez to drive to Hartford, where he helped in hiding the registration plate and the sweatshirts.

## II. *Jury Composition.*

The defendants argue that they were not afforded a fair trial because the jury venire did not adequately represent a fair cross section of the Essex County community.[2] Specifically, the defendants complain that the jury venire underrepresented the Hispanic population of Essex County. We conclude that the defendants have not met their burden of making a prima facie case of jury underrepresentation.

We have delineated the characteristics of the jury contemplated by art. 12 of the Massachusetts Declaration of Rights, remarking that "a fair jury is one that represents a cross section of community concepts." *Commonwealth* v. *Soares*, 377 Mass. 461, 478, cert. denied, 444 U.S. 881 (1979), quoting *Commonwealth* v. *Ricard*, 355 Mass. 509, 512 (1969). A defendant is entitled to a jury selection process free from discrimination against groups in the community. *Commonwealth* v. *Soares*, *supra*, quoting *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 92 (1973).

The Supreme Court of the United States has affirmed the requirement that a jury fairly represent a cross section of the community. In *Taylor* v. *Louisiana*, 419 U.S. 522, 528 (1975), the Court held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." The *Taylor* Court recognized that "excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." *Id.*, quoting *Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting). The right to trial by a jury drawn fairly from a representative cross section of the community serves the critical purposes of guarding against the exercise of arbitrary power and making available the commonsense judgment of the community. *Commonwealth* v. *Soares*, *supra* at 479-480. A jury cannot be an effective safeguard if it represents only special segments of the population, excluding distinctive groups from the pool. *Id.* at 480, quoting *Taylor* v. *Louisiana*, *supra* at 530. The "broad representative character of the jury should be

---

[2]Because of concerns over pretrial publicity, in lieu of a change in venue, the defendants were tried in Hampden County by a jury selected from Essex County.

maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." *Commonwealth* v. *Soares, supra,* quoting *Taylor* v. *Louisiana, supra* at 530-531.

The requirement that a jury comprise a representative cross section of the community simultaneously ensures that the jury will contribute the community's commonsense judgment to the proceedings. *Commonwealth* v. *Soares, supra* at 479-480. "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." *Commonwealth* v. *Soares, supra* at 480-481, quoting *Peters* v. *Kiff,* 407 U.S. 493, 503-504 (1972).

Despite these principles, we have recognized that a requirement that each jury include members of every group in the community is impracticable. See *Commonwealth* v. *Soares, supra* at 481-482 (requiring mathematically representative venire would be impossible due to random nature of juror selection). Furthermore, removal of jurors from a panel because of expressed bias impedes the ability to formulate a panel mathematically representative of all groups, yet removal of such persons is necessary to a fair trial. *Id.* at 482. We have therefore refrained from imposing a requirement that petit juries actually chosen must precisely mirror all groups in the community. *Id.* Instead, "[w]hat both parties are constitutionally entitled to expect is 'a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits.' " *Id.* at 488, quoting *People* v. *Wheeler,* 22 Cal. 3d 258, 277 (1978).

To establish a prima facie case of unconstitutional jury selection under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, the defendants must show that (1) the group allegedly discriminated against is a "distinctive group" in the com-

munity, (2) that the group is not fairly and reasonably represented in the venires in relation to its proportion of the community, and (3) that underrepresentation is due to systematic exclusion of the group in the jury selection process.[3] See *Commonwealth* v. *Prater*, 431 Mass. 86, 91 (2000), quoting *Commonwealth* v. *Tolentino*, 422 Mass. 515, 518-519 (1996). It is not disputed that Hispanics comprise a "distinctive group" within Essex County. See *Commonwealth* v. *Tolentino*, *supra* at 519. The defendants, however, fail to meet their burden on the second and third elements of their claim.

To demonstrate the underrepresentation of Hispanics in their Essex County petit jury venire, the defendants submitted statistical data to the court as follows.[4] The defendants submitted census bureau statistics drawn from the 1990 Federal census stating that 5.5% of the Essex County adult population was Hispanic, and that the venire from which their trial jury was chosen consisted of 345 prospective jurors, of which the stenographer recorded 342 names. According to the defendants, only three surnames of those 342 prospective jurors were listed in the population division of the United States census bureau's Building a Spanish Surname List for the 1990's — A New Approach to an Old Problem. Use of the surname list to identify Hispanics is premised on the fact that more than two-thirds of Hispanic individuals living in the United States have a surname appearing on that list, which contains the 639 most frequently occurring "heavily Hispanic" surnames. The defendants further contend that using standard mathematical extrapolation techniques indicate that no more than five of the 342 prospective jurors identified by surname, or 1.46%, were Hispanic.

Reliance on surname analysis alone to identify Hispanic jurors is invalid evidence of underrepresentation. See *Commonwealth* v. *Fryar*, 425 Mass. 237, 242, cert. denied, 522 U.S. 1033

[3] "When our decisions on jury composition are read together, it is apparent that art. 12 affords [defendants] at least as much protection as the Sixth and the Fourteenth Amendment[s]." *Commonwealth* v. *Fryar*, 425 Mass. 237, 244, cert. denied, 522 U.S. 1033 (1997), and cases cited.

[4] The defendants provided no data to support an argument that Hispanics were underrepresented in the Hampden County grand jury venire, and they have abandoned that argument on appeal. We focus only on their claims of underrepresentation in the Essex County petit jury venire.

(1997); *Commonwealth* v. *Colon,* 408 Mass. 419, 438 n.11 (1990). As one court has noted:

> "The surname approach has [the] result of failing to account for 'Hispanics' who either through marriage or adoption obtain an English surname. Similarly, surname classifications fail to consider 'Hispanics' whose surnames are not commonly considered Spanish, whose surnames are a result of varied European ancestry, whose surnames have been Anglicized, or whose surnames are derived from other than Castillian Spain . . . . Non-Spanish surnames (e.g., Banchs, Dols, Galtieri, Cristiani, Domecq) are frequently found among Latin Americans but are not found in·the Spanish surname lists." *Alen* v. *State,* 596 So. 2d 1083, 1093 (Fla. Dist. Ct. App. 1992), aff'd, 616 So. 2d 452 (Fla. 1993).

The data the defendants offer does not meet their burden of showing underrepresentation for another reason. The single venire brought into the court room for the defendants' trial is an unacceptably small sample for the purpose of any statistical showing of underrepresentation. See *Commonwealth* v. *Tolentino, supra* at 520. A defendant must do more than assess a small subsection of the venire present on a particular day in order to show that the group allegedly discriminated against is not fairly and reasonably represented in the venires in relation to its proportion of the community. See *id.* A defendant must present evidence of a statistically significant sample, usually requiring analysis of the composition of past venires. See *id.* (noting defendant failed to produce reliable data concerning "ordinary and regular composition of jury venires in Essex County"); *Commonwealth* v. *Colon, supra* at 438; *Commonwealth* v. *Peters,* 372 Mass. 319, 323 (1977). See also *Commonwealth* v. *Fryar, supra* at 241; *Commonwealth* v. *Bastarache,* 382 Mass. 86, 96 (1980).

Other jurisdictions have endorsed the use of broad time frames for purposes of analyzing underrepresentation. See *United States* v. *Rioux,* 97 F.3d 648, 657 (2d Cir. 1996) (suggesting life of master jury "wheel" sufficiently broad); *United States* v. *Grisham,* 63 F.3d 1074, 1078-1079 (11th Cir. 1995), cert. denied, 516 U.S. 1084 (1996) (defendant must show un-

derrepresentation in qualified jury wheel); *Singleton* v. *Lockhart*, 871 F.2d 1395, 1398 (8th Cir.), cert. denied, 493 U.S. 874 (1989) (defendant must show underrepresentation not only on his venire but also other venires in same judicial system near time of his trial); *Timmel* v. *Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986) (same). The statistics offered by the defendants pertaining only to the defendants' own jury venire do not provide a large enough sample over a great enough period of time to demonstrate underrepresentation in the Essex County jury pool in any meaningful way.

In addition the defendants' data sample would not in any event support a claim of underrepresentation for purposes of art. 12. Consistent with the majority of jurisdictions, we apply the absolute disparity test to determine whether underrepresentation of a group is substantial.[5] *Commonwealth* v. *Prater*, 431 Mass. 86, 92 (2000), quoting *Commonwealth* v. *Fryar*, *supra* at 242-243 ("The majority of courts have looked to the absolute disparity test to determine whether underrepresentation of a group is substantial"). To calculate absolute disparity, the percentage of a group's population in the jury venire is subtracted from the percentage of the group's population in the community. See *Commonwealth* v. *Fryar*, *supra* at 243. In this case, eligible Hispanics comprise 5.5 per cent of the community and, according to the defendants' surname analysis, comprise 1.46 per cent of the jury venire. The absolute disparity in this case is therefore 4.04 per cent. Courts adopting the absolute disparity test have held that a disparity below 10 per cent is generally not substantial. *Id.*, and cases cited. The disparity here, therefore, does not support a claim of a constitutional violation.

The defendants urge us to abandon the absolute disparity test in favor of other methods. They argue that because the Hispanic

---

[5]A majority of jurisdictions apply the absolute disparity test. See *Duren* v. *Missouri*, 439 U.S. 357, 364-366 (1979); *Castaneda* v. *Partida*, 430 U.S. 482, 495-496 (1977); *United States* v. *Williams*, 264 F.3d 561, 568-569 & n.4 (5th Cir. 2001); *United States* v. *Royal*, 174 F.3d 1, 6-11 (1st Cir. 1999) (rejecting comparative disparity in favor of absolute disparity test); *United States* v. *Clifford*, 640 F.2d 150, 155-156 (8th Cir. 1981), cited in *United States* v. *Rogers*, 73 F.3d 774, 775-777 (8th Cir.), cert. denied, 517 U.S. 1239 (1996) (applying absolute disparity for reason of stare decisis); *United States* v. *Sanchez-Lopez*, 879 F.2d 541, 547 (9th Cir. 1989).

populations in nearly every county were under 11 per cent during the relevant time period, no defendant could successfully establish underrepresentation using the absolute disparity test. Although we are aware that the absolute disparity test has been criticized as being "too [ready to] tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing," *United States* v. *Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990), cert. denied, 499 U.S. 904 (1991), it remains the test most widely used. Additionally, we do not apply the absolute disparity test mechanically, but rather consider the evidence of a disparity in light of the circumstances and the size of the population in question. Evidence of a disparity smaller than 10 per cent can support a conclusion of unconstitutional underrepresentation of smaller minority groups, especially when coupled with persuasive evidence of systematic exclusion. The circumstances of these cases and the absence of persuasive proof of systematic exclusion do not allow such a conclusion.

Furthermore, the methods the defendants suggest in place of the absolute disparity test are equally problematic. The defendants suggest that the comparative disparity test should be utilized. That test is calculated by subtracting the per cent population of the group in the venire from the per cent population of the group in the community, and then dividing the result by the per cent population of the group in the community. This method has been criticized mainly because it can overstate the degree of underrepresentation in the case of a small minority population, and relatively few courts apply it. See *Commonwealth* v. *Fryar, supra* at 242-243 n.6, citing Note, A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel, 103 Yale L.J. 1913 (1994) (discussing shortcomings of comparative disparity test). In this case, the comparative disparity test is not a reliable indication of Hispanic underrepresentation in jury venires, and for the same reasons stated in the *Fryar* case, we decline to adopt that test. *Id.*

The defendants also suggest that we adopt the "disparity of risk test." That test measures the likelihood that the difference

between a group's representation in the jury pool and its population in the community will result in a significant risk that the jury will not fairly represent the group. See Note, *supra* at 1929-1935. We are not aware of any jurisdiction that has adopted this test for determining whether a defendant's constitutional rights are violated by statistical underrepresentation in the jury pool, and we decline to adopt it now. Statistical analysis may develop other methodologies that do not suffer the failings of the methods considered here, and our endorsement of one should not be considered as a complete foreclosure of others. See *United States* v. *Royal*, 174 F.3d 1, 6-7 n.3 (1st Cir. 1999).

The defendants have also failed to prove that any underrepresentation was due to systematic exclusion of Hispanics in the jury selection process. Exclusion is systematic when it is inherent in that process. See *Smith* v. *Commonwealth*, 420 Mass. 291, 294 (1995), quoting *Duren* v. *Missouri*, 439 U.S. 357, 366 (1979). Essex County, like all others, uses the "one-day one-trial" system set forth in G. L. c. 234A, in which the county submits an annual census list to the jury commissioner. Names from the census list are randomly sorted by a computer that then generates a list of randomly selected names for the jury pool. See *Commonwealth* v. *Tolentino, supra* at 523; *Commonwealth* v. *DeArmas*, 397 Mass. 167, 170 (1986). This system contains "no element of subjectivity in the compilation of the venire" and has "much to commend it for its assurance of randomness in the selection process." *Commonwealth* v. *Colon, supra* at 438. See *Commonwealth* v. *Tolentino, supra* at 523. The one-day one-trial system, of course, "cannot completely ensure a jury pool that reflects the community's composition, if the basic data from which the selection is made fails to reflect, with some degree of accuracy, that composition." *Id.*

The defendants contend that data collection practices in major cities in Essex County resulted in the systematic exclusion of Hispanics from the annual census lists and, therefore, from Essex County venires. In support of their argument, the defendants rely, inter alia, on the February 14, 1992, report of the Hampden County district attorney's commission on civil rights (report), which concluded that it was likely that minorities were

underrepresented in Hampden County jury pools because of data collection practices in Holyoke and Springfield, cities with the largest black and Hispanic populations. The defendants also point to the fact (as found in that report, as well as reports of the Supreme Judicial Court's Commission to Study Racial and Ethnic Bias in the Courts) that a disproportionate number of undeliverable summonses are addressed to inner city locations. According to 1990 census bureau data, 74.5% of Massachusetts's Hispanic residents live at central city addresses. Whatever the merits of these claims, we agree with the judge that this evidence is not probative of the practices in Essex County. The February, 1992, report of the district attorney only analyzed data from Hampden County, and the court's commission study focused on Suffolk, Worcester, and Hampden counties. See *Commonwealth* v. *Tolentino, supra* at 518, 521-522.

The defendants also claim that 89.3% of Essex County's Hispanic population lives in the cities of Haverhill, Lynn, Lawrence, Peabody, and Salem. The defendants aver that, in each city, unreliable and discretionary practices resulted in systematic exclusion of Hispanics from the jury pool. While the proffer suggests that census collection procedures may not fully identify all residents who are potentially available for jury duty, the defendants have not demonstrated that these practices resulted in systematic exclusion of Hispanics from the jury pools in Essex County as a whole. We once again "encourage aggressive attempts to contact those who do not respond to make the juror lists as complete as possible. Ultimately, however, the completeness and accuracy of the juror lists depends in large part on the cooperation of citizens." *Commonwealth* v. *Fryar, supra* at 244.

We conclude that the judge did not abuse her discretion in denying the defendants' motions to dismiss the venire and for a new trial. In this capital case, and on our own review of the record, we also conclude that the composition of the jury that convicted the defendants did not give rise to a substantial likelihood of a miscarriage of justice.

III. *Posttrial Motions.*

After trial, the defendants moved for approval of costs and

expenses to retain a statistician and Hispanic linguist, and sought disclosure of jury attendance lists and clerk's lists. The motions were aimed at gathering information to present challenges to the selection process of the Hampden County grand jury and the Essex County trial jury. The judge referred the motions to a single justice of this court. Following a hearing, the single justice denied the motions as to the grand jury and transferred the motions concerning the trial jury to the trial judge, who was in a better position to gauge their worth.

The judge held a nonevidentiary hearing on the remanded motions. She denied the motions, concluding that the defendants were unable to make a prima facie showing in support of their claims. Subsequently, the judge denied the defendants' motion to reconsider. More than one year later, on July 31, 1997, the defendants filed an ex parte motion for funds for "completing and supplementing the analysis of Essex County jury data previously presented in this case." The trial judge denied the motion on August 1, 1997. The defendants appealed from the judge's denial of funds to a single justice of the Appeals Court pursuant to G. L. c. 261, § 27D, who affirmed the judge's order.

A. *Motions for funds to engage experts.*[6] Funds are generally not available under G. L. c. 261, § 27C, for defendants seeking posttrial relief. See *Commonwealth* v. *Serino*, 436 Mass. 408, 415-416 (2002); *Commonwealth* v. *Carter*, 429 Mass. 266, 270 (1999); *Commonwealth* v. *Davis*, 410 Mass. 680, 682-684 (1991). There was no abuse of discretion or error of law in the denials of these motions. See *Commonwealth* v. *Sowell*, 412 Mass. 1009 (1992).

B. *Posttrial discovery motions.* Discovery in the context of a new trial motion under Mass. R. Crim. P. 30 (c) (4), 378 Mass. 900 (1979), is not a matter of right. The motion and affidavits must first establish a prima facie case before discovery is avail-

---

[6]The defendants appealed the trial judge's denial of their motions for funds to a single justice of the Appeals Court pursuant to G. L. c. 261, § 27D, whose determination is generally considered to be final and not subject to review in this court. See *Sinath Im* v. *Commonwealth*, 432 Mass. 1018 (2000). However, we have held that the denial of a motion for funds to retain experts, in conjunction with a new trial motion, would be treated as properly before this court on the defendant's direct appeal in a capital case. See *Commonwealth* v. *Erdely*, 430 Mass. 149, 154 (1999).

able. Once that hurdle is cleared, discovery is within the judge's broad discretion. Cf. *Commonwealth* v. *Stewart*, 383 Mass. 253, 261 (1981).

We review the rulings of the single justice for abuse of discretion or error of law. See *Commonwealth* v. *Sowell, supra.* The single justice concluded, "[T]here is little or no chance of success in any motion for a new trial that might be presented with respect to the composition of the Hampden County grand jury that indicted the defendants," citing *Commonwealth* v. *Pope*, 392 Mass. 493, 497-506 (1984). The single justice did not abuse his discretion in denying discovery as to the Hampden County grand jury.

.After reviewing the defendants' motions with respect to the Essex County trial jury, the judge concluded that the defendants had not made a prima facie showing on which relief could be granted and thus denied their motions. The judge rejected the informal survey of Essex County bar advocates as to the composition of juries in Essex County and the statistical analysis of that data as incompetent hearsay, and noted that the use to which the defendants sought to put information from the jury commissioner (namely, surname analysis) was unreliable. She further stated "that the defendants did not present any theory as to how the jury selection procedure in Essex County systematically excluded Hispanics from the jury venire." Although the judge did not specifically address the defendants' requests for a demographer, raised for the first time in their motions to reconsider, her conclusions are supported by the record and her denial of the defendants' motions did not result from an abuse of discretion.

The defendants protest that the judge acted on their motion without holding an evidentiary hearing. Whether to hold an evidentiary hearing under Mass. R. Crim. P. 30, 378 Mass. 900 (1979), is a matter soundly within the judge's discretion, to which we defer. See, e.g., *Commonwealth* v. *Birks*, 435 Mass. 782, 792 (2002); *Commonwealth* v. *Sullivan*, 435 Mass. 722, 733-734 (2002). In exercising her discretion, the judge must determine whether the motion or affidavits give rise to a "substantial issue" that would require an evidentiary hearing. See *Commonwealth* v. *Birks, supra*; *Commonwealth* v. *Sullivan,*

*supra*; *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001). Whether a substantial issue has been raised depends on the seriousness of the issue and the adequacy of the defendants' showing. See *Commonwealth* v. *Sullivan, supra*; *Commonwealth* v. *Britto, supra*. The judge's conclusion that the defendants' motion and affidavits did not raise a substantial issue are entitled to substantial deference. See *id.* We conclude that the judge did not abuse her discretion in declining to afford the defendants an evidentiary hearing.

C. *Information on race and ethnicity.* The right to a trial before a jury representing a fair cross section of the community is a critical constitutional protection and should be scrupulously honored by providing defendants with reasonable access to accurate information concerning the race and ethnicity of prospective jurors. Racial and ethnic bias in the Massachusetts courts is an issue of long-standing concern. In response to the recommendations contained in the report of the Supreme Judicial Court's Commission to Study Racial and Ethnic Bias in the Courts, the office of the jury commissioner requests prospective jurors voluntarily to disclose their racial and ethnic background in the juror confirmation form. This information has been collected since 1996, and the jury commissioner's office keeps statistics based on responses that are submitted. This approach, however, is no longer sufficient.

Asking prospective jurors voluntarily to provide information concerning membership in a racial or ethnic minority on juror confirmation forms has proved to be an inadequate source of information for defendants seeking to establish a claim of underrepresentation. See *Commonwealth* v. *Tolentino*, 422 Mass. 515, 521-522 (1996). Self-identification is the most common-sense method for determining the ethnic and racial composition of the jury venire, but our current method of asking for mere voluntary disclosure of this information fails to compile the information we need to assess the issue of underrepresentation.

More proactive measures are required in order to confront issues of racial and ethnic prejudice in the courts, both actual and perceived. The Federal courts require potential jurors to provide information on race, informing jurors that the information is required solely to enforce nondiscrimination in jury selection.

See 28 U.S.C. § 1869(h). We now adopt the same approach, and instruct the jury commissioner, as soon as practicable, to require the disclosure of racial and ethnic background of potential jurors on the juror confirmation form,[7] which should be modeled after the "juror qualification form" used in the Federal courts.

This gap in the court's own gathering of information, however, does not relieve the defendants of their burden of proving a prima facie case with reliable data. *Commonwealth* v. *Tolentino, supra*, citing *Commonwealth* v. *Aponte*, 391 Mass. 494, 497 & n.7 (1984). The defendants were not without access to basic information from which they could proceed to discover the ethnic identity of the prospective jurors. Pursuant to G. L. c. 234A, §§ 10, 15, the numbered resident list that each city and town submits to the jury commissioner and the commissioner's randomly generated prospective jury list for each city and town are available on request. See *Commonwealth* v. *Aponte, supra* at 497 (defendants utilized mailing list to personally contact grand jurors to determine ethnicity and race). Thus, our change in gathering this information henceforth has no impact on the present case.

IV. *Jury Instructions.*

The defendants claim a number of errors in the judge's jury instructions. Both defendants claim that the judge erred in giving an overly broad definition of malice and failing to limit the consideration of extreme atrocity or cruelty to the factors delineated in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). Arriaga also argues that the judge's instructions on premeditation permitted conviction on the proof of any of the three prongs of malice. Delgado argues that the extreme atrocity or cruelty instructions improperly created a conclusive presumption that pleasure or indifference to pain is cruelty; the judge did not instruct that the jury had to find deliberate premeditation on the part of Delgado to find him guilty on that theory; and the instructions directed the jury to find Delgado guilty as an accessory for whatever crime the jury found Arriaga guilty. Because there was no objection to the instructions, we review to

---

[7] See G. L. c. 234A, § 21.

determine whether there was error, and if so, whether the error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 587 (2001). We consider and reject the defendants' exceptions in turn.

A. *"Frame of mind" language in malice instruction.* The defendants argue that the judge's instructions on malice improperly included in the definition "not only anger, hatred, and revenge but also every other unlawful and justifiable . . . [or] purposeful, selfish, wrongful motive," permitting the jury to conclude the killing of the victim was murder without actually finding malice of either the first or third type. We disapproved of this broader definition of malice in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), concluding that the language "is not helpful and ought in the future to be omitted." This definition of malice, however, was commonly used in murder trials prior to 1995. See *Commonwealth* v. *Stockwell*, 426 Mass. 17, 23 n.6 (1997). Viewing the malice instructions as a whole, see *Commonwealth* v. *Carrion*, 407 Mass. 263, 270 (1990), and considering the offending portions in context, it is apparent that the Commonwealth's burden was not lowered and the error did not result in a substantial likelihood of a miscarriage of justice. The judge's instructions included the three prongs of malice outlined in *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). We have repeatedly held that instructions containing both the obsolete definition and the three prong definition adequately convey the meaning of malice to the jury. See *Commonwealth* v. *Stroyny*, 435 Mass. 635, 649-651 (2002); *Commonwealth* v. *Johnson*, 426 Mass. 617, 622 (1998); *Commonwealth* v. *Fryar*, 425 Mass. 237, 245 (1997).

B. *Extreme atrocity or cruelty factors.* The defendants also maintain that the judge erred in failing to instruct the jury that to find extreme atrocity or cruelty, they must find the presence of one of the *Cunneen* factors. The defendants rely on our decision in *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994), *S.C.*, 427 Mass. 651 (1998), in which we stated that the Commonwealth is required to prove one of the *Cunneen* factors. The defendants were tried prior to the *Hunter* decision and the rule set out there is not applied retroactively. See *Commonwealth* v. *James*, 424 Mass. 770, 790 (1997). The judge instructed the

jury on the *Cunneen* factors, and the fact that the judge did not indicate to the jury the necessity of finding one or more of those factors did not give rise to a substantial likelihood of a miscarriage of justice.

C. *Premeditation.* Arriaga complains that the judge's instructions erroneously allowed the jury to convict him of premeditated murder under any of the three prongs of malice. The judge's instructions on murder in the first degree on the theory of premeditation and deliberation provided that the Commonwealth must prove an unlawful killing, deliberate premeditation, and malice aforethought, but did not instruct that to find murder in the first degree with premeditation and deliberation, they must find the first prong of malice, namely an intent to kill. This was error. *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001), and cases cited. Read in their entirety, however, the instructions conveyed to the jury the requirements for a conviction of premeditated murder. The judge instructed that deliberate premeditation required the defendant to have thought before he acted, but did not require any specific amount of time for deliberation. "Premeditation, as defined by the judge in this case, contains as a necessary condition of guilt the specific intent to kill." *Id.* The jury returned a verdict of murder in the first degree on the theory of deliberate premeditation, and there is no doubt that they found Arriaga had the specific intent to kill. Furthermore, the jury also returned a conviction of murder in the first degree based on the theory of extreme atrocity or cruelty; thus, Arriaga was not likely to have been prejudiced, and the erroneous instruction on the alternative theory of deliberate premeditation did not create a substantial likelihood of a miscarriage of justice.

D. *Definition of cruelty.* Delgado complains that the judge's instruction that indifference or pleasure in pain is cruelty improperly created a conclusive presumption of cruelty, taking a factual consideration away from the jury. The judge instructed the jury according the factors articulated in *Commonwealth* v. *Cunneen, supra,* and also stated, "I instruct you that indifference to or knowledge of and pleasure in a victim's pain is cruelty, and extreme cruelty is only a higher degree of cruelty." We have held that there is no error in an instruction identical in all material respects to the one given by the judge in the instant

case. See *Commonwealth* v. *Painten,* 429 Mass. 536, 547-548 (1999), citing *Commonwealth* v. *Rosa,* 422 Mass. 18, 30 n.13 (1996). There was no error.

E. *Premeditation under accessory charge.* Delgado argues that the judge erred in failing to instruct the jury that there had to be deliberate premeditation on his part to convict him on that theory of accessory to murder in the first degree. The judge specifically outlined the requirement of deliberate premeditation in the discussion of murder in the first degree with deliberate premeditation, and stated that those definitions would apply to the charge against Delgado. The judge instructed that to find Delgado guilty of being an accessory before the fact to first degree murder, "the Commonwealth must prove beyond a reasonable doubt that, one, Mr. Delgado knew Mr. Esteras was to be murdered. Two, with this knowledge, shared a specific intent as I have defined that to you with Mr. Arriaga or Mr. Cintron or both to murder Mr. Esteras. And, three, with such knowledge and specific intent, Mr. Delgado did some act that contributed toward the accomplishment of the murder." This instruction in combination and with reference to the judge's earlier and complete instruction as to deliberate premeditation was sufficient. There was no error.

F. *Individual guilt.* Delgado complains that the judge's instructions as to accessory before the fact directed the jury to find him guilty of whatever crime they found Arriaga guilty. The judge's instructions as to accessory before the fact required the jury to find that Delgado had knowledge, specific intent that the murder be committed, and committed an act in furtherance of the killing. The instruction was sufficient to indicate to the jury that these findings would have to be specific and individual to Delgado to find him guilty as an accessory before the fact to the victim's murder. There were no error.

We conclude that the defendants' claims of error, viewed individually or in combination, did not give rise to a substantial likelihood of a miscarriage of justice.

V. *Delgado's Claims of Error.*

A. *Testimony of Ismael Cintron.* Delgado argues that the judge erred in permitting the Commonwealth to elicit Cintron's testimony that he was selling drugs supplied from "95

Bancroft." He claims that it only showed guilt by association and was more prejudicial than probative. He also argues that Cintron's agreement with the Commonwealth for "truthful" testimony deprived him of due process. We disagree.

1. *Guilt by association.* During his direct testimony, Cintron testified that he did not have a "personal beef" with the victim and that "the mission was for the family." On cross-examination, Delgado's defense counsel elicited that Cintron had had "minor" problems and "[v]erbal arguments" with the victim. Counsel then asked whether these disputes concerned drugs, and Cintron looked to his attorney and answered, "I guess I have to say, no." Cintron's counsel objected to any further drug-related inquiries. Delgado's counsel argued that the subject was appropriate for cross-examination because it was probative of whether Cintron had a "personal vendetta" that could have motivated him to commit the murder on his own. The judge declared a short recess, during which Cintron and his counsel conferred. Following the break, the judge deemed that Cintron had waived his privilege by taking the stand and stated she would order him to answer. Cintron explained that he and the victim had argued over a particular street corner that they both "liked to use" to sell drugs.

On recross-examination by Delgado's counsel, Cintron stated that he did not tell the police or the prosecutor about his arguments with the victim because the murder was not "based on the drugs." Counsel then approached Cintron with a letter he had written while in jail to a fellow inmate who claimed to be related to the victim. Counsel extensively questioned Cintron about the details of the letter and elicited that, according to the letter, "everything was cool between [Cintron] and [the victim] until [Cintron was] selling a lot more drugs than [the victim] and making a lot more money." Cintron's subsequent efforts to make peace with the victim were unsuccessful and the two were to settle the issue in a fight.

On further redirect examination, the prosecutor sought to introduce the entire letter in evidence. Over the defendant's objection, the judge allowed the prosecutor to read the letter to the jury. After reading the letter, the prosecutor asked Cintron when he started selling more drugs and making more money

than the victim. Cintron answered that occurred "[a]bout the first week of September." The prosecutor then asked what happened that caused him to sell more and make more money. Cintron answered, "I started getting a heavy supply of dope." Next, the prosecutor asked where he got the drugs and Delgado's counsel objected. The objection was overruled. After Cintron answered, "95 Bancroft," defense counsel asked to approach sidebar.

The judge ruled that "[t]he door has been open[ed]" by Delgado's counsel on the issue of Cintron's drug dealing: "just as [Delgado's] defense counsel wanted to establish that Mr. Cintron was acting apart from the Latin Kings when he dealt drugs, the Commonwealth has a right to put before the jury that he was not independent from the Latin Kings." The judge ruled correctly.

The scope of redirect examination is within the sound discretion of the trial judge. *Commonwealth* v. *Maltais*, 387 Mass. 79, 92 (1982). "A defendant who claims, on appeal, an abuse of discretion, assumes a heavy burden." *Id.* In this case, that burden has not been met. "The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination." *Commonwealth* v. *Marrero*, 427 Mass. 65, 69 (1998), quoting *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375 (1978). Delgado opened the door to this information, while trying to establish that Cintron had an independent motive to murder the victim. Delgado essentially invited the Commonwealth to address the issue on redirect examination, and the Commonwealth was entitled to do so in an attempt to rehabilitate its witness. See *Commonwealth* v. *Marrero*, *supra* at 69, and cases cited.

2. *Agreement with the Commonwealth.* Delgado complains that Cintron's testimony regarding his agreement with the Commonwealth requiring his truthful testimony, and the "coercive" nature of the agreement, deprived Delgado of his due process rights. He argues that when a jury are told that the prosecution has made a deal with a witness in exchange for truthful testimony, there is an implication that the Commonwealth has a special ability to determine the truth of the witness's statement, and that implication results in a kind of vouching. Additionally, Del-

gado argues that the deal the Commonwealth struck with Cintron in exchange for his truthful testimony had the effect of calling Cintron to testify to please the prosecutor in order to secure his deal and to avoid a consecutive life sentence for perjury in a capital case.

At trial, Cintron acknowledged that he had an agreement with the Commonwealth where, in exchange for truthful testimony, he would have the opportunity to plead guilty to murder in the second degree. He also admitted that he had given three statements to police: one following the murder in September; a second in January, 1993; and a third in July, 1993. The first two statements were essentially consistent, but the third contained some differences. On cross-examination, Arriaga's counsel asked why Cintron did not include in his second statement that Arriaga had pulled the gun out of his hand. Cintron answered that he was not aware that the consequences of not relaying the "exact truth" would be "a lot of [prison] time."

On redirect examination, the prosecutor asked Cintron if he knew what would happen if he lied on the stand. Delgado's counsel objected, and the judge ruled that the question was appropriate for redirect examination.[8] To the prosecutor's question, Cintron answered, "I get life for the murder charge and another life on and after for lying in the murder trial." Consistent with her ruling, the judge immediately cautioned the jury that only they, and not the district attorney, are the determiners of truth. The judge also repeated a similar instruction in her jury charge. The judge's immediate and forceful instructions prevented any misuse of the evidence by the jury. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989). We

---

[8]The judge concluded as follows: "I think the question was, because he has been attacked on cross, and appropriately so for manufacturing evidence, et cetera, an absolutely fair inquiry on cross-examination. But also it has been attempted to be established on cross that the purpose of his testimony is basically to give what the district attorney wants to hear, and it has little to do with the truth.

"This is a fair area of inquiry for redirect. The reason I said I would give an instruction is exactly for the purpose you just stated, consistent with what I view the present state of the case law. . . . And I am going to be giving an instruction to the jury. So the answer will stand, whatever that answer is. And that the district attorney is not the one who determines the truth, they are the ones who determine the truth here, and we will go from there."

do not require any particular words in cautioning a jury, so long as they focus the jury's attention on the particular care they must give to considering testimony given pursuant to a plea agreement contingent on truthful testimony. *Id.* The judge's instructions properly focused the jury's attention. See *Commonwealth* v. *Rivera*, 430 Mass. 91, 97 & n.5 (1999) (involving essentially same instruction from same judge).

Furthermore, Delgado's argument that Cintron was bound to testify to a particular set of facts rather than to the truth is inaccurate. The agreement was not "that the Commonwealth's performance [was] contingent on [his] testimony conforming to the Commonwealth's version of the events." *Commonwealth* v. *Gordon*, 422 Mass. 816, 834 (1996). Rather, it was for truthful testimony, and such an inducement does not produce the same incentive to lie as would an agreement contingent on conviction. See *id.*; *Commonwealth* v. *Ciampa*, *supra* at 261-262 n.5. The same holds true for Cintron's fear of perjury. See *Commonwealth* v. *Dixon*, 425 Mass. 223, 233 (1997). Evidence of this fear, ushered in through the door opened by Arriaga on cross-examination, did not imply any special ability on the part of the Commonwealth to ensure the truth of the witness's testimony. *Id.*, contrasting *Commonwealth* v. *Meuse*, 38 Mass. App. Ct. 772, 773-776 (1995), *S.C.*, 423 Mass. 831 (1996). There was no error, and Delgado was not deprived of due process.

B. *Testimony of Carlos Rodriguez.* Delgado complains that the judge improperly allowed the prosecution to elicit a statement by Carlos Rodriguez including an allegation that the Latin Kings were involved in drug dealing and taking over neighborhoods. He contends that this testimony impermissibly suggested he was involved in these activities and that it equated to guilt by association. He further contends that the judge erred in allowing the prosecution to rehabilitate Rodriguez with his prior consistent statement, and that the judge's strong curative instruction after admitting Rodriguez's inadmissible opinion was not effective. We disagree.

During cross-examination of Carlos Rodriguez, Delgado's counsel elicited that Rodriguez knew that the Commonwealth wanted him to testify in a particular way, namely that Cintron

was not the shooter. Counsel then suggested, through further questioning, that the Commonwealth was using Rodriguez's pending drug charges as incentive to secure such testimony and, accordingly, had secured repeated continuances to keep those cases pending. During the testimony of Sergeant Devine, the prosecutor offered Rodriguez's statement made to the police after the killing, which predated his drug charges, as a prior consistent statement.

It was proper for the judge to allow evidence of Rodriguez's prior consistent statement to rebut Delgado's suggestion that his testimony was the product of the Commonwealth's influence and pressure. See *Commonwealth* v. *Rivera, supra* at 99-100; *Commonwealth* v. *Brookins,* 416 Mass. 97, 102-103 (1993), and cases cited. The judge gave an appropriate limiting instruction regarding the use of the prior consistent statement. See *Commonwealth* v. *Rivera, supra.*

After the reading of the statement, Delgado's counsel moved for a mistrial, objecting to the reference in the statement to the "Latin Kings dealing drugs and taking over neighborhoods, things like that." The judge denied the motion and upbraided counsel for not objecting prior to the reading of the statement. The judge then gave a strong curative instruction.

"Jurors are expected to follow instructions to disregard matters withdrawn from their consideration." *Commonwealth* v. *Gunter,* 427 Mass. 259, 263 (1998), quoting *Commonwealth* v. *Helfant,* 398 Mass. 214, 228 (1986). The judge's instruction was immediate and forceful, describing the illicit reference as "not admissible," "incompetent," and "simply speculation." She reminded the jurors of their oaths and to abide by her instructions, emphasizing that the challenged statement was "not evidence" and had "no place in the court." The judge did not abuse her discretion in denying the defendant's motion, and no substantial likelihood of a miscarriage of justice resulted.

C. *Testimony of Maria Mercado.* Delgado maintains that he was not informed of the true terms of Maria Mercado's plea agreement with the Commonwealth, that Mercado perjured herself, and the Commonwealth still honored its agreement with her and did not prosecute her for her perjury. He claims that the Commonwealth's failure to disclose the true elements of its

agreement with Mercado, that she was not required to tell the truth, deprived him of his rights. We reject the defendant's arguments for the same reasons as the motion judge; they are without merit. The judge's rulings as to these issues did not involve any abuse of discretion and they do not give rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Jervis*, 368 Mass. 638, 647 (1975).

VI. *Ineffective Assistance.*

Arriaga argues that his trial counsel rendered ineffective assistance in conceding both in his opening and closing statements that Arriaga was guilty of murder in the second degree. Arriaga argues that his counsel abandoned any reasonable theory of defense in conceding guilt. We disagree.

We consider the defendant's claims to determine whether there is a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Specifically, we look to see whether "there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* A tactical decision by an attorney constitutes error "only if it was manifestly unreasonable when made." *Commonwealth* v. *Frank*, 433 Mass. 185, 190 (2001), quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

We have found no error in concessions of guilt, including of murder in the second degree, when such a concession is warranted by the circumstances. See *Commonwealth* v. *Doane*, 428 Mass. 631, 633-634 (1999) (defense counsel's concession of murder in the second degree in closing argument reasonable because due to evidence, "there was very little defense counsel could argue"); *Commonwealth* v. *Gould*, 413 Mass. 707, 713-714 (1992); *Commonwealth* v. *Griffith*, 404 Mass. 256, 263-264 (1989); *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 537-538 (1975); *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 13-14 (1973) ("When the time came to close to the jury, counsel had evidently concluded that all he could do for his client was to try to mitigate punishment and that complete candor was the best strategy. . . . Counsel's strategy failed, but we are not on that account to say that it was impermissible"). When the evidence

implicating the defendant is strong, and a concession does not undercut viable defenses, a tactical concession of guilt by counsel in a murder prosecution is securely within the realm of effective representation.

In the instant case, Arriaga's trial counsel knew that Cintron would testify implicating Arriaga, and that his testimony would be corroborated by other witnesses and physical evidence. The prosecutor's opening detailed the evidence she would adduce in the Commonwealth's case-in-chief to prove not only that Arriaga was a joint venturer in the murder, but that he was the shooter. Trial counsel's concession of his client's guilt of murder in the second degree allowed him to attack the Commonwealth's proof of murder in the first degree, pursue a consistent theme throughout the trial, and convey the impression of forthrightness, an attribute lacking from the strategy Arriaga now advocates.

The cases Arriaga relies on in support of his claim that his counsel's approach was manifestly unreasonable are readily distinguishable from the case at hand. Arriaga cites *Commonwealth* v. *Street*, 388 Mass. 281 (1983), and *Commonwealth* v. *Westmoreland*, 388 Mass. 269 (1983), two cases in which we held that counsels' concessions of guilt deprived their clients of effective assistance. In each case, counsel conceded guilt, abandoning defenses of lack of criminal responsibility and lack of specific intent that were potentially supported by the facts and the law. See *Commonwealth* v. *Street*, *supra* at 286-287; *Commonwealth* v. *Westmoreland*, *supra* at 273-274. Arriaga's counsel did no such thing. Similarly, his reliance on two decisions of the United States Court of Appeals for the Eleventh Circuit, *Francis* v. *Spraggins*, 720 F.2d 1190 (11th Cir. 1983), cert. denied sub nom. *Kemp* v. *Spraggins*, 470 U.S. 1059 (1985), and *Young* v. *Zant*, 677 F.2d 792 (11th Cir. 1982), is misplaced. In both of those cases, defense counsel misunderstood the bifurcated nature of the death penalty proceedings and mistakenly made concessions during the guilt phase to lay the groundwork for pleas for mercy. See *Francis* v. *Spraggins*, *supra* at 1193-1195; *Young* v. *Zant*, *supra* at 798-799.

"We have said that the guaranty of the right to counsel is not an assurance to defendants of brilliant representation or one free

of mistakes; nor does it entitle a reviewing court to engage after the event in a reconsideration of whether counsel's tactical plans or his objections or failures to object to evidence were to the client's best advantage. Nor need counsel advance defences for which he can find no evidential support in order to fend against later charges of incompetence or ineffectiveness." *Commonwealth* v. *LeBlanc, supra* at 13-14. Considering the overwhelming evidence against Arriaga, the fact "[t]hat the defendant was convicted of first degree murder demonstrates no inadequacy of counsel, but rather the near hopelessness of the defendant's position . . . ." *Commonwealth* v. *Gould, supra* at 714, citing *Commonwealth* v. *LeBlanc, supra* at 13. See also *Commonwealth* v. *Griffith, supra* at 263. We cannot say that counsel's tactics were manifestly unreasonable, and counsel did not abandon his role as advocate by arguing for mitigation to murder in the second degree. *Id.* at 263-264. No substantial likelihood of a miscarriage of justice arose.

In addition, the defendants each argue that their respective counsel rendered ineffective assistance in failing to preserve error and to pursue and develop the motions to dismiss the venire. Little is offered by either defendant to support these contentions. As discussed above, there is no basis for us to conclude that the claimed underrepresentation of Hispanics was substantial or resulted from systematic exclusion in the jury selection process. The defendants have not demonstrated that trial counsel erred in failing to pursue the motions to dismiss the venire and have not demonstrated a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright, supra* at 682 (1992).

VII. *G. L. c. 278, § 33E.*

We have reviewed the entire record and decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the verdicts of the defendants.

*Judgments affirmed.*

*Orders denying posttrial motions affirmed.*