Alex DELGADO, Petitioner

v.

Kathleen M. DENNEHY, Commissioner of Corrections, Respondent.

Civil Action No. 04–30124–MAP.

United States District Court,
D. Massachusetts.

Aug. 27, 2007.

John M. Thompson, Thompson and Thompson, PC, Springfield, MA, for Petitioner.

Annette C. Benedetto, Department of Attorney General, Boston, MA, for Respondent.

*MEMORANDUM REGARDING
RESPONDENT'S MOTION
TO DISMISS*

(Dkt. No. 25)

PONSOR, District Judge.

## I.  *INTRODUCTION*

Petitioner Alex Delgado, a state prisoner serving a life term for his participation in a 1992 murder, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Respondent Kathleen M. Dennehy has moved to dismiss his petition, arguing that none of the arguments offered by Petitioner entitles him to the relief he seeks.

On March 19, 2007, this court allowed Respondent's motion. This memorandum will set forth the reasons supporting that ruling.

## II.  *STANDARD OF REVIEW*

### A.  *AEDPA.*

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996), a petition for *habeas corpus* may only be granted if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

According to the Supreme Court, the "contrary to" prong of § 2254(d)(1) covers instances where "a state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a [different] result." *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J.). "Avoiding these pitfalls does not require" a state court to cite the controlling Supreme Court case—"indeed, it does not even require awareness of [the controlling case], so long as neither the reasoning nor the result of the state-court decision contradicts [it]." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *see also Bell v. Cone,* 543

U.S. 447, 455, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005).

The "unreasonable application" prong of § 2254(d)(1) is implicated whenever a state court "correctly identifies the governing legal principle from the Supreme Court's decisions but then unreasonably applies that principle to the facts of the prisoner's case." *Caputo v. Nelson,* 455 F.3d 45, 49 (1st Cir.2006) (citation omitted). In determining whether a state-court decision unreasonably applies Supreme Court precedent, "a federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495. As the First Circuit has noted, "an erroneous or incorrect application is not necessarily an unreasonable application." *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir.2002) (en banc) (citation omitted).

In addition, under AEDPA, a factual determination " 'made by a State court shall be presumed to be correct,' and the petitioner has 'the burden of rebutting the presumption of correctness by clear and convincing evidence.' " *Obershaw v. Lanman,* 453 F.3d 56, 59 (1st Cir.2006) (quoting 28 U.S.C. § 2254(e)(1)), *cert. denied,* —— U.S. ——, 127 S.Ct. 957, 166 L.Ed.2d 727 (2007). "For this purpose, 'facts' are defined as 'basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.' " *Sanna v. Dipaolo,* 265 F.3d 1, 7 (1st Cir.2001) (citation omitted).

Ultimately, AEDPA's standard of review, while strict, "only applies . . . when the state court decided the federal issue." *Fortini v. Murphy,* 257 F.3d 39, 47 (1st Cir.2001), *cert. denied,* 535 U.S. 1018, 122

S.Ct. 1609, 152 L.Ed.2d 623 (2002). In cases where the state court declines or neglects to address a constitutional claim raised by a petitioner, a federal district court must review that claim *de novo. Watkins v. Murphy,* 292 F.3d 70, 75–76 (1st Cir.2002).

**B.** *Fed.R.Civ.P. 12(b)(6).*

"Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts provides that the Federal Rules of Civil Procedure apply 'to the extent that they are not inconsistent with [*habeas* ] rules.' " *Banks v. Dretke,* 540 U.S. 668, 687 n. 8, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *see also* Fed.R.Civ.P. 81(a)(2).

Motions to dismiss *habeas* petitions pursuant to Fed.R.Civ.P. 12(b)(6) are not inconsistent with *habeas* rules. Thus, in ruling on a respondent's motion to dismiss for failure to state a claim upon which relief may be granted, a district court is "obliged to 'assume all facts pleaded by [the petitioner] to be true.' " *Walker v. True,* 399 F.3d 315, 319 (4th Cir.2005) (Luttig, J.) (citation omitted), *vacated on other grounds by* 546 U.S. 1086, 126 S.Ct. 1028, 163 L.Ed.2d 849 (2006).

Of course, this assumption does not apply to factual determinations made by the state courts, which are presumed to be correct absent clear and convincing evidence to the contrary.

### III. *BACKGROUND*

**A.** *The Crime.*[1]

On September 13, 1992, Arnaldo Esteras, Carlos Rodriguez, and Carlos Cruz were standing on a Springfield street cor-

---

**1.** The following factual summary is taken from *Commonwealth v. Arriaga,* 438 Mass. 556, 781 N.E.2d 1253 (2003), the decision by

the Supreme Judicial Court of Massachusetts ("SJC") pertinent to the petition.

ner when Ismael Cintron walked by wearing his "Latin Kings" beads. *Commonwealth v. Arriaga*, 438 Mass. 556, 559, 781 N.E.2d 1253 (2003). Esteras demanded that Cintron "[t]ake off the mother fucking beads" and "Rodriguez threatened to give Cintron an 'ass whipping'" if he did not. *Id.*

Cintron complied but later "reported the incident" to other Latin Kings, including Petitioner, the gang's vice-president. The leaders of the Latin Kings concluded that Esteras should be "terminated" for the insult and armed Cintron and Hector Arriaga with a gun and a knife in order to carry out their "mission." *Id.*

At approximately 9:15 P.M., Arriaga used the gun to shoot Esteras three times. The sixteen year-old died from these wounds in the emergency room of a Springfield hospital about fifteen minutes later. *Id.* at 560, 781 N.E.2d 1253.

Shortly after the shooting, another Latin King named Cruz Gonzalez drove Cintron and Arriaga to Hartford, Connecticut, where they disposed of the gun, along with their dark, hooded sweatshirts and a stolen license plate that had been affixed to the getaway car. *Id.*

When several witnesses to the murder identified Cintron as a participant, Springfield police officers went to the local Latin Kings headquarters, an apartment at 95 Bancroft Street. There, they found a jacket bearing Cintron's street name and Arriaga's wallet. *Id.*

Gonzalez and Cintron were arrested when they returned to Springfield on the morning of September 14, 1992, and Amherst police took Petitioner into custody later that same day. The following day, Gonzalez informed law enforcement officers where they could find the stolen registration plate, the sweatshirts, and the gun. Petitioner's fingerprint eventually turned up on the registration plate. *Id.*

### B. Pre–Trial Proceedings.[2]

On October 2, 1992, a Hampden County grand jury indicted Arriaga on one count of first degree murder and one count of conspiracy to commit murder. On January 19, 1993, it charged Petitioner with being an accessory before the fact to the murder, and the two cases were subsequently joined.

Prior to Petitioner's trial, the grand jury charged a number of other individuals who participated in the decision to kill Esteras with conspiracy to commit murder. (*See* Dkt. No. 8, Ex. 2, R.App. of Appellant Delgado on Appeal to SJC 155.) During the pre-trial phase of Petitioner's case, the Commonwealth informed Petitioner that Maria Mercado, one of the alleged conspirators, would be a witness against him and her "cooperation, including her truthful testimony," would be taken "into consideration in resolving the charge pending against her." (Dkt. No. 43, Ex. B, Letter from Laurel H. Brandt, Asst. District Att'y, to David P. Hoose, Esq., Greg T. Schubert, Esq., Terrance M. Dunphy, Esq., Richard J. Rubin, Esq., Andrew M. Klyman, Esq., and Terry Scott Nagel (May 6, 1993).)[3]

During Petitioner's pre-trial detention, the trial judge found that Petitioner "and

---

**2.** Petitioner maintains that Respondent's recitation of the prior proceedings in this case is, "[f]or the most part," "accurate" but "incomplete." (Dkt. No. 43, Pet'r's Mem. in Opp'n to Resp't's Mot. to Dismiss 6.)

To the extent that factual disputes exist that were not addressed by the SJC, they have been resolved in Petitioner's favor.

**3.** As will be discussed, Mercado also agreed to testify against a co-conspirator named Hugo Morales.

Arriaga, along with other Latin King members, joined in an orchestrated effort to intimidate witnesses, including Maria Mercado." (Dkt. No. 8, Ex. 4, R.App. of Appellant Arriaga on Appeal to SJC 298.) As part of this campaign, Petitioner "wrote to Mercado from his jail cell following his arrest and in that correspondence made it clear that her children's safety was in jeopardy if she didn't remain silent about what happened." (*Id.* at 322–23.)

Prior to their trial, Petitioner and Arriaga moved for a change of venue due, in part, to prejudicial publicity. In response to this motion, the trial judge elected to impanel the jury in Essex County and bring the jurors to Hampden County for the trial. According to the trial judge, Petitioner and Arriaga not only consented to this arrangement but "suggested Essex County as an appropriate locus from which to choose the trial jurors" based on the fact that "the percentage of citizens of Hispanic origin or heritage in Essex County was comparable to that of Hampden County." (*Id.* at 289.)[4]

Jury selection began on September 7, 1993. While 350 prospective jurors were summoned each day, a large number of them did not respond and a great many others who did show up were excluded for

cause.[5] Accordingly, it took four days to pick a jury of sixteen.

As this process unfolded, Petitioner's trial counsel came to believe that African American and Hispanic residents of Essex County were grossly underrepresented in the array. On September 8, 1993, he noted the dearth of nonwhite prospective jurors and lodged an objection to the array for that reason. (*See* Dkt. No. 29, Trial Tr. vol. 2, 164:12–166:12, Sept. 8, 1993.)

On September 10, 1993, Petitioner's trial counsel made an oral motion, pursuant to Mass. R.Crim. P. 20(a), to discharge the jury that had been impaneled on the ground that the venires from which it was selected did not represent a fair cross section of the ethnic composition of Essex County. (*See* Dkt. No. 31, Trial Tr. vol. 4, 201:3–202:22, Sept. 10, 1993.)

To establish a *prima facie* violation of the fair cross section requirement a defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this un-

---

**4.** Petitioner admits that he consented to this arrangement, but argues that in moving for a change of venue, his trial counsel did not request a specific county and was unfamiliar with the demographics of Essex County.

**5.** In denying Petitioner's motion for a new trial, the trial judge stated that

> Some 350 prospective jurors were summoned on the first two days of the impanelment, with between 70 and 90% actually appearing.

(Dkt. No. 8, Ex. 4, R.App. of Appellant Arriaga on Appeal to SJC 289; *see also* Dkt. No. 26, Resp't's Mem. in Supp. Mot. to Dismiss 6.)

However, a review of the trial transcript reveals that far fewer prospective jurors actu-

ally appeared. (*See* Dkt. No. 31, Trial Tr. vol. 4, 205:13–18, Sept. 10, 1993 ("The [J]ury [C]ommissioner worked with me in June in summoning in 350 people per day into this county for this trial. Between 70 to approximately 90 per day showed up."); *see also* Dkt. No. 29, Trial Tr. vol. 2, 166:22–167:17 ("The record will reflect I ... made contact with the Jury Commissioner in June of this year and ... following the standard provisions of the Jury Commissioner's Office, 350 jurors a day were called in here. Yesterday we had one hundred respond. Today we had 76 respond[ ] to that notification.... [T]he people who are responding represent probably one third of the people who were notified....").)

derrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Commonwealth v. Ramos,* 406 Mass. 397, 405–06, 548 N.E.2d 856 (1990) (quoting *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).

Although he was aware of these legal standards, Petitioner's trial counsel "had neither the time nor resources ... to undertake the investigation needed to fully document the problem, and to develop evidence that the underrepresentation of non-white people in the array was a systemic phenomenon." (R.App. of Appellant Delgado on Appeal to SJC 142–43.) [6] When the trial judge denied the Rule 20(a) motion, Petitioner's trial counsel "did not request that the trial be delayed, nor seek authorization to expend Commonwealth funds to hire an investigator and demographic expert ... because [he] knew it would be futile given the time and resources that had gone into selecting the jury." (*Id.* at 144–45.)

Petitioner now contends that it would have been possible for his trial counsel to obtain jury pool records maintained by the Commonwealth's Jury Commissioner, which would have revealed the names and addresses of prospective Essex County jurors. Armed with this information and the funds to which he would have been entitled, *see* Mass. Gen. Laws Ch. 261, § 27C(4), Petitioner asserts that trial counsel could have established a *prima facie* violation of the fair cross section guarantee by contacting these individuals and asking them to identify themselves by race and ethnicity, *see, e.g., Common-*

*wealth v. Aponte,* 391 Mass. 494, 497, 462 N.E.2d 284 (1984) (using such a process to determine the racial and ethnic identities of prospective Essex County grand jurors).

## C. *Petitioner's Trial.*

Petitioner's trial began on September 13, 1993. During its case-in-chief, the Commonwealth offered the testimony of Mercado, who stated that she was present at 95 Bancroft Street when Petitioner and other Latin King leaders discussed how to respond to Cintron's confrontation with Esteras. (*See, e.g.,* Dkt. No. 35, Trial Tr. vol. 8, 99:18–23, Sept. 15, 1993 (stating that Petitioner was "very upset" and said "something had to be done").) According to Mercado, Petitioner not only insisted that Esteras be terminated, but instructed Cintron and Arriaga on how the killing should be carried out. (*See, e.g., id.* 107:20–108:5.) [7]

At the close of her direct examination, Mercado explained that her cooperation agreement with the Commonwealth required her to testify truthfully and only obligated the Commonwealth to "consider" her truthful testimony when deciding how to prosecute the charge against her. (*Id.* 192:12–194:1.) During her cross-examination, Mercado acknowledged that the maximum penalty for conspiracy to commit murder was twenty years in state prison. (*Id.* 280:18–23.) However, she refused to admit that the prospect of a lengthy prison sentence motivated her decision to become a cooperating witness. (*Id.* 281:21–283:3.)

On redirect, the assistant district attorney asked Mercado whether she had seen the disclosure letter that had been sent to

---

6. Prior to the selection of the jury in this case, the SJC had held that visual observations alone were "an insufficient basis for any showing of discriminatory practices." *Commonwealth v. Colon,* 408 Mass. 419, 438 n. 11, 558 N.E.2d 974 (1990).

7. Mercado also testified that Hugo Morales was present at the Bancroft Street apartment and participated in the murder by instructing Mercado to keep a visitor to the apartment out of the back bedroom where leaders of the gang had congregated. (*Id.* 104:13–105:8.)

defense counsel prior to trial. (Dkt. No. 36, Trial Tr. vol. 10, 65:7–10, Sept. 16, 1993; *see also* Letter from Laurel H. Brandt, Asst. District Attorney, to David P. Hoose, Esq., Greg T. Schubert, Esq., Terrance M. Dunphy, Esq., Richard J. Rubin, Esq., Andrew M. Klyman, Esq., & Terry Scott Nagel (May 6, 1993).) After Mercado indicated that she recognized the letter, the prosecutor read the portion of it which noted the Commonwealth's agreement to take her "cooperation, including her truthful testimony, into consideration in resolving the charge pending against her." (*Id.* 65:11–18.) When the prosecutor proceeded to ask whether she had "any agreement with the Commonwealth concerning what specific outcome there will be of her charge," Mercado answered, "None." (Dkt. No. 36, Trial Tr. vol. 10, 66:8–11, Sept. 16, 1993.)

During her recross-examination, Petitioner's trial counsel and Mercado engaged in the following exchange:

Q: They want you to testify against [Petitioner], right?

A: (No response)

Q: That's what you're here for; isn't it?

A: To bring justice.

Q: You know what you have to say to get the deal from the Commonwealth; right?

A: No, sir.

Q: You don't know?

A: I'm only saying the truth.

Q: Let me ask you this, Miss Mercado, do you think if you went and told [the prosecutor]; Gee, I would like to cooperate, and ... we are all innocent; do you think she would have taken care of your kids?

And do you think she would have said: "We will do something about your case?"

A: She never said she was going to do something about my case.

Q: As far as you know, you're just doing this because of the goodness of your heart, right?

A: I cannot deal with it in my conscience.

Q: You don't expect they will do anything for you with this; is that right?

A: That's correct.

Q: You think you will probably be treated just like any other common criminal who comes into this courthouse, right?

A: I'm not treated any differently, sir.

Q: You're not hoping they do you a favor in exchange for your testimony; is that right?

A: I never put thought into that.

Q: It's never crossed your mind that this will help you out; right?

A: I need to get this out of my conscience.

Q: Could you please answer my question.

A: To be specific: I can't.

Q: You can't tell me whether you ever thought about it or not?

A: I just need to say the truth.

Q: That's not my question. My question is, have you thought about it? Have you thought about how this will help you?

A: No, sir.

(*Id.* 68:20–71:4.)

The following day, Petitioner testified in his own defense and admitted participating in a discussion that resulted in a decision to authorize the *beating* of Esteras. (*See* Dkt. No. 37, Trial Tr. vol. 10, 51:11–52:10, Sept. 17, 1993.) According to Petitioner, Arriaga and Cintron acted independently in murdering the victim.

On September 20, 1993, the jury convicted Arriaga of murder in the first degree,

and it convicted Petitioner of being an accessory before the fact to the murder.

### D. *The Morales' Trial.*

Approximately two weeks later, the Superior Court judge who presided over Petitioner's trial presided over the trial of Hugo Morales. During this trial, Mercado described Morales' involvement in the murder in much greater detail than she did during Petitioner's trial or in the statements she had previously provided to the police. (*See* R.App. of Appellant Delgado on Appeal to SJC 167, ¶¶ 6–7.) According to the trial judge, when

> [c]onfronted with these inconsistencies by Morales' defense counsel, Ms. Mercado claimed she had provided the newly revealed details of Morales' involvement in the conspiracy to the prosecutor. The same assistant district attorney prosecuted both the Morales case and the Delgado/Arriaga cases. The prosecutor informed the court that Ms. Mercado had not told her about the newly revealed details of Morales involvement.... [W]hile the jury who heard his case was deliberating, Morales pled guilty to the indictment and based upon an agreed recommendation of counsel, ... [was] sentenced ... to a suspended term ... in state prison.

(R.App. of Appellant Arriaga on Appeal to SJC 319–20.)

The trial judge concluded that the Commonwealth's support for such a lenient recommendation was due in large part to "the inconsistencies between Ms. Mercado's testimony at the Morales trial regarding the extent of Morales' involvement in the conspiracy, and her statements to the police, as well as her testimony in the Delgado/Arriaga trial regarding Morales' participation in the criminal venture." (*Id.* at 320.)

On January 18, 1994, Mercado pled guilty to the conspiracy indictment against her and was sentenced to an agreed recommendation of time served. (*Id.*)

### E. *Post–Trial State Court Proceedings.*

Following their convictions, both Petitioner and Arriaga obtained new counsel and filed appeals with the SJC. *See Murphy v. Dennehy*, No. 05–12246–DPW, 2007 WL 430754, at *1 (D.Mass. Feb.5, 2007) (noting that all first-degree murder convictions in Massachusetts are reviewed directly by the SJC pursuant to Mass. Gen. Laws ch. 278, § 33A). While their appeals were pending, Petitioner and Arriaga filed motions for new trials, which the SJC remanded to the trial court for consideration.

Pursuant to Mass. Gen. Laws ch. 234A, § 15, the Jury Commissioner for the Commonwealth of Massachusetts must

> make the prospective juror list of any city or town available for inspection by members of the public upon request; provided, however, that such lists shall be available only to insure the integrity of the juror selection process and the accountability of the office of jury commissioner, and that the jury commissioner shall have discretionary authority to refuse to provide such lists for commercial or research purposes.

Mass. Gen. Laws ch. 234A, § 15. Notwithstanding the plain language of this provision, the record reflects that the Jury Commissioner refused Petitioner's request for juror records relating to the selection of grand and petit juries in Hampden and Essex Counties.

On September 16, 1995, Petitioner filed a motion with the SJC seeking an order directing the Jury Commissioner to disclose this information, as well as a motion seeking funds to retain a statistician and a Hispanic linguist to review the records to determine whether Hispanic residents

were underrepresented in the jury veni-res.[8] A single Justice of the SJC denied the motion with respect to the grand jury records and remanded the balance to the Superior Court. (R.App. of Appellant Delgado on Appeal to SJC 48–49.)

On February 8, 1996, the trial judge ruled that Petitioner did not have a reasonable prospect of establishing a *prima facie* violation of the fair cross section guarantee. As a result, she denied Petitioner's motion for funds and refused to order the Jury Commissioner to afford Petitioner access to ostensibly public documents.

In reaching this conclusion, the trial judge refused to credit an informal survey of thirty-three Essex County bar advocates, which, according to Petitioner's statistician, tended to show that "Hispanics were consistently underrepresented on jury venires." (R.App. of Appellant Arriaga on Appeal to SJC 280.) The trial judge also found that Petitioner could not establish a fair cross section violation claim by examining the surnames of individuals summoned for jury duty since this was an "inherently unreliable" method of satisfying the second prong of the *prima facie* case. (*Id.* at 281.)

Petitioner subsequently filed a motion for reconsideration, arguing that the trial judge's rejection of his preliminary evidence put him in "the Catch–22 position of having to prove his case in order to qualify for assistance in investigating it." (R.App. of Appellant Delgado on Appeal to SJC 51.) The trial judge denied the motion on February 22, 1996, and a single Justice of the Massachusetts Court of Appeals upheld this ruling on July 6, 1996.

On April 29, 1996, Arriaga's counsel, acting on behalf of his client and Petitioner, filed a request with the Jury Commissioner under the Massachusetts Freedom of Information Act, Mass. Gen. Laws ch. 66, § 10, seeking Essex County juror attendance records for January through September, 1993. The Jury Commissioner denied this request on May 21, 1996, asserting that the information sought could not be disclosed absent a court order. (R.App. of Appellant Arriaga on Appeal to SJC 249–50.)

On June 5, 1997, Arriaga's counsel made another request for the Jury Commissioner's ch. 234A § 15 lists for Essex County for January through September, 1993. (*Id.* at 252.) Again, this request was denied.

On July 31, 1997, Petitioner filed an *ex parte* motion for funds to hire Professor Gordon F. Sutton for the purpose of furthering his fair cross section claim. (R.App. of Appellant Delgado on Appeal to SJC 146.) In making this request, Petitioner explained that Professor Sutton had recently used his case as "a teaching vehicle in a course he taught at the University of Massachusetts in applied demographics." (*Id.* at 147.)

Apparently, those involved in this project had been given access to information concerning Essex County jury pools from July 1, 1993 to September 17, 1993. (*See* R.App. of Appellant Arriaga on Appeal to SJC 141; *see also* R.App. of Appellant Delgado on Appeal to SJC 119 (acknowledging that Professor Sutton's class had access "to some of the jury composition data sought in Appellant's discovery motion").) Although Arriaga presented the results of this project as part of his motion for a new trial, Petitioner argued that

**8.** Petitioner later amended this request in order to obtain funds to hire a demographer instead of a linguist and statistician. (*See*

Dkt. No. 8, Ex. 1, Br. of Appellant Delgado on Appeal to SJC 43 n. 10.)

additional funds were necessary because the "data developed by Prof. Sutton in conjunction with the students' efforts was incomplete and needed refinement." (R.App. of Appellant Delgado on Appeal to SJC 148.)

The trial judge denied Petitioner's request for funds on August 1, 1997, and a single Justice of the Appeals Court affirmed this ruling on October 17, 1997.

On September 3, 1998, Arriaga's counsel contacted the Jury Commissioner again and "reminded him that [they] had earlier been in contact concerning juror records maintained by his office, and refreshed his recollection about the nature of [these] discussions by reading him the opinion letter . . . upon which [the Jury Commissioner] had relied in denying prior requests for juror records." (Dkt. No. 43, Ex. C, Stephenson Aff. ¶ 2.) Arriaga's attorney then asked the Commissioner

> whether his past refusal to release information . . . was because [counsel] had requested attendance lists rather than master lists or some other form of listing. Citing prospective jurors' rights to privacy, he stated unequivocally that his office would under no circumstances release any lists by which jurors might be individually identified except upon a court order.

(*Id.* ¶ 3.)

When the trial court denied Petitioner's motion for a new trial on September 7, 1999, the SJC consolidated his appeal of this decision with Petitioner's direct appeal. On January 27, 2003, the SJC affirmed Petitioner's conviction and the denial of his motion for a new trial, as well as orders by the trial judge denying Petitioner's post-trial motions for funds and discovery.

F. *Federal Court Proceedings.*

Petitioner commenced this action on June 30, 2004. His petition for a writ of *habeas corpus* initially raised five grounds for relief. In Ground One, Petitioner alleged a violation of his Sixth Amendment "right to an impartial jury representing a fair cross section of the community from which his jury was selected." (Dkt. No. 1, Pet. for *Habeas Corpus,* add. C.)

Ground Two asserted that state court rulings on Petitioner's discovery motions and requests for financial assistance violated his constitutional rights to equal protection, due process, and access to the courts. Specifically, Petitioner pointed to the failure of state officials "to require prospective jurors to state their racial or ethnic identity or otherwise collect the information needed to determine whether the jury composition and selection system was actually providing a fair cross section in the source bodies from which Petitioner's jury was chosen." (*Id.*) Petitioner also argued that he was improperly denied, as an indigent person, "the information and financial resources he needed to independently obtain the information necessary to litigate his federal constitutional fair cross section claim in his direct appeal of his conviction." (*Id.*) In addition, Petitioner claimed that the state court overlooked an obligation "to accept [his] substantial preliminary data as reliable for the limited purpose of ruling on his motions for the discovery and financial assistance he needed to fairly litigate his federal constitutional claim." (*Id.*)

In Ground Three, Petitioner maintained that the trial court failed to give jury instructions which accurately described elements of the charged offense.

In Ground Four, he charged that "[t]he prosecution withheld the actual terms and conditions of Maria Mercado's cooperation agreement from the defense and made a

false and materially misleading presentation of that agreement to the jury." (*Id.*)

Finally, in Ground Five, Petitioner took the position that his trial counsel rendered constitutionally ineffective assistance in failing to: (I) properly document his fair cross section challenge; (ii) offer timely objections to inappropriate jury instructions; and (iii) request a cautionary instruction concerning Mercado's testimony.

On September 16, 2004, Respondent denied Petitioner's allegations and asserted the following defenses: (1) the state court adjudication did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; (2) the petition contains issues of state law not cognizable of federal *habeas* review; (3) the petitioner has procedurally defaulted one or more of his claims and the decision of the SJC rests on an adequate and independent state law ground; and (4) the petition fails to state a claim upon which *habeas corpus* relief can be granted. (Dkt. No. 7, Resp't's Answer 2.) That same day, Respondent filed a supplemental answer containing briefs and decisions from Petitioner's state appeal.[9]

After the court issued a scheduling order for the filing of dispositive motions, Petitioner sought and obtained several extensions based on his intention to seek financial assistance in retaining Professor Sutton to assist him in the presentation of his fair cross section claim. On April 6, 2005, Petitioner filed an *ex parte* motion

pursuant to the Criminal Justice Act of 1964, which allows "counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation" to "request them in an *ex parte* application." 18 U.S.C. § 3006A(e)(1).

In support of this motion, Petitioner acknowledged the possibility that Essex County jury pool records for the year preceding his trial no longer existed. Assuming such information was unavailable, Petitioner maintained that Professor Sutton's services "were necessary to present to the Court evidence of the nature of the opportunity to prove Petitioner's fair cross section claim lost by the state's refusal to grant Petitioner ... access to the data, when the data was available." (Dkt. No. 15, Pet'r's Mem. in Supp. of *Ex Parte* Mot. for Funds 13.)

When the court allowed this motion on a conditional basis, Respondent filed a motion for reconsideration, arguing that any factual development by Petitioner of his fair cross section claim would run afoul of the requirement that a *habeas* petitioner "inform the state court of both the *factual* and legal underpinnings of the claim." *Scarpa v. DuBois*, 38 F.3d 1, 6 (1st Cir. 1994) (emphasis added), *cert. denied*, 513 U.S. 1129, 115 S.Ct. 940, 130 L.Ed.2d 885 (1995).[10]

In response, Petitioner moved to strike Respondent's motion on the ground that Respondent lacked standing to intervene

---

9. Regrettably, the state court appellate briefs submitted by Petitioner and his co-defendant appear to contain a number of notations made by counsel for the Commonwealth. (*See, e.g.*, Dkt. No. 8, Ex. 4, Br. of Appellant Arriaga on Appeal to SJC 36–41.) The notations have been ignored.

In the future, the Commonwealth should take care to include only clean copies of briefs when amassing the state court record.

10. As the First Circuit has observed, "[t]he fair presentation of facts has generated little ado. Rather, ... it is ... the sufficiency with which the applicant's legal theory was presented ... which has much bedeviled courts." *Nadworny v. Fair*, 872 F.2d 1093, 1096 (1st Cir.1989) (citations omitted).

in a proceeding under § 3006A(e)(1). *See United States v. Abreu*, 202 F.3d 386, 390 (1st Cir.2000) (defining *"ex parte"* as "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested" (quoting *Black's Law Dictionary* 597 (7th ed.1999))).

In an electronic order dated June 23, 2005, the court denied the motion to reconsider, stating that "Respondent's substantive arguments will be addressed in due course." Petitioner subsequently filed a supplemental memorandum in which he presented two versions of Professor Sutton's project. The first assumed the existence of Essex County jury pool information for the year preceding Petitioner's trial and proposed integrating this data with data previously furnished to the state courts. The second version of the project assumed the unavailability of additional data and merely contemplated the re-processing of data previously analyzed by Professor Sutton's students.

On August 2, 2005, the court allocated funds to cover the costs of the second version. The purpose of this ruling was to afford Petitioner the opportunity to refine, rather than expand, the state court record and to give him the chance to establish the impact of the Jury Commissioner's refusal to abide by the clear terms of Section 15 of Chapter 234A.

Nine months later, the court ordered the parties to submit status reports due to the absence of any recorded activity in the case. In her report, Respondent took the position that "the case could be resolved expeditiously in the same manner as are the vast majority of *habeas corpus* petitions, i.e., through the filing of memoranda by the parties on all procedural issues and/or the merits pursuant to a Scheduling Order." (Dkt. No. 20, Resp't's Status Report 2.)

For his part, Petitioner suggested that Respondent be given the opportunity to file a motion to dismiss based only on the second and third defenses set forth in her answer. Following the adjudication of these affirmative defenses, Petitioner proposed a process whereby he would file motions for discovery and an evidentiary hearing and the court would determine whether either was necessary to resolve the merits of Petitioner's surviving claims.

Petitioner indicated that while his fair cross section challenge required additional refinement, such work would be complete by the time the court was ready to address any claims which survived Respondent's second and third defenses. (*See* Dkt. No. 21, Pet'r's Status Report 3, 4.) Though the report also conveyed Petitioner's intention to file, within one week, "a sealed status report" as to the state of Professor Sutton's work, a review of the docket reveals that no such report was ever filed.

On June 5, 2006, the court issued a scheduling order directing Respondent to "file a dispositive motion with regard to *any* defense to the petitioner currently available, with a supporting memorandum, no later than July 7, 2006." (Dkt. No. 22, Scheduling Order 1 (emphasis added).) After receiving several extensions, Respondent filed the pending motion to dismiss on August 25, 2006. Petitioner then sought and obtained two extensions before filing his opposition on November 7, 2006.

Following the arguments of counsel on November 16, 2006, the court took the matter under advisement and, in due course, issued the short memorandum and order noted above, allowing Respondent's motion to dismiss.

## IV. *DISCUSSION*

In his brief opposing Respondent's motion, Petitioner withdrew his claims con-

cerning jury instructions on the element of extreme atrocity or cruelty (Dkt. No. 43, Pet'r's Mem. in Opp'n to Resp't's Mot. to Dismiss 2 n. 1), as well as his claim that trial counsel was ineffective in failing to request an instruction directing the jury to view Mercado's testimony with care (*id.* at 2–3 n. 2). During oral argument, Petitioner also conceded that the trial court's instructions relating to malice did not give rise to a viable claim.

In light of these concessions, it is undisputed that Respondent's motion to dismiss should be allowed with respect to Ground Three, and Ground Five now offers an ineffective assistance claim based solely on the failure of trial counsel to fully document the fair cross section challenge he asserted.

Citing the ongoing efforts of his demographer, Petitioner maintains that Claims One, Two, and Five are not ripe for judicial review. For her part, Respondent continues to take the position that Petitioner should not be allowed to use Professor Sutton to marshal new evidence in an attempt to show that Commonwealth courts unreasonably applied federal law.

In *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), the Supreme Court addressed the issue of whether supplemental evidence, submitted by a California state prisoner at the request of a federal *habeas* court, had "the effect of undermining the policies of the exhaustion requirement." *Id.* at 258, 106 S.Ct. 617. In that case, the prisoner sought a reversal of his murder conviction based on the exclusion of African Americans from the Kings County grand jury that indicted him. *Id.* at 225–56, 106 S.Ct. 617. Recognizing "a need to 'supplement and clarify' the state-court record presented for review," the district court ordered

the parties to assess "the mathematical probability that chance or accident could have accounted for the exclusion of blacks from the Kings County grand jury over the years at issue." *Id.* at 257, 259, 106 S.Ct. 617.[11]

In response to the state's contention that the computer analysis submitted by the prisoner's expert rendered his equal protection claim a "wholly different animal," the Supreme Court held that this "new" evidence "did not fundamentally alter the legal claim already considered by the state courts." *Id.* at 259, 260, 106 S.Ct. 617.

Like the supplemental statistical analysis presented in *Vasquez,* the analysis of Essex County jury pools Petitioner sought to present in this case was based on data already in the state court record. Consequently, it appears unlikely that the introduction of Professor Sutton's analysis would have contravened the exhaustion requirement. *Cf. Williams v. Washington,* 59 F.3d 673, 677 (7th Cir.1995) (permitting the introduction of new evidence "which was available to the state courts from other evidentiary sources").

Of course, the court cannot be certain of this conclusion because Professor Sutton's analysis has not been introduced. Indeed, since receiving funds to retain Professor Sutton on August 2, 2005, Petitioner has provided little information as to the status, or preliminary results, of his expert's work.

As noted above, Petitioner never submitted "the sealed status report" he referenced on June 2, 2006; nor did he object to this court's subsequent order directing Respondent to file a dispositive motion based on any of the defenses asserted in

---

**11.** The district court also directed the parties to file affidavits confirming certain uncontest-

ed facts. *Vasquez,* 474 U.S. at 258–59, 106 S.Ct. 617.

her answer. Twice, Petitioner requested (and received) extensions to file his opposition to Respondent's motion to dismiss, but on neither occasion did he mention Professor Sutton.

On November 16, 2006, Petitioner's counsel did report that an illness had delayed Professor Sutton's analysis of the relevant data. However, in the nine months since oral argument, Petitioner has offered no additional information as to the health of his demographer or the state of his work.

Petitioner has had more than sufficient time to develop and present his analysis of the data relevant to the jury selection process, but none has been provided. In light of this, the court has no choice but to confine itself to the record as it appeared to the SJC in assessing Petitioner's claims of constitutional error.

A. *Ground One.*

The concept of the jury trial in this country now "contemplates a jury drawn from a fair cross section of the community." *United States v. Benjamin,* 252 F.3d 1, 12 (1st Cir.2001) (quoting *Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)).[12] As noted above, establishing a *prima facie* case of a fair cross section violation requires a petitioner to show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*United States v. Gonzalez–Velez,* 466 F.3d 27, 39 (1st Cir.2006) (citing *Benjamin,* 252 F.3d at 12; *Duren,* 439 U.S. at 364, 99 S.Ct. 664).

▇ If a petitioner succeeds in setting forth a *prima facie* case, the government bears the burden of showing "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process ... that result in the disproportionate exclusion of a distinctive group." *Duren,* 439 U.S. at 367–68, 99 S.Ct. 664.

▇ In an attempt to demonstrate the inadequate representation of Hispanics in this case,[13] Petitioner "submitted census bureau statistics drawn from the 1990 Federal census stating that 5.5% of the Essex County adult population was Hispanic." *Arriaga,* 438 Mass. at 563, 781 N.E.2d 1253. Petitioner also submitted evidence showing that "the venire from which [his] trial jury was chosen consisted of 345 prospective jurors, of which the stenographer recorded 342 names." *Id.*[14]

Because "only three surnames of those 342 prospective jurors were listed in the population division of the United States census bureau's *Building a Spanish Surname List for the 1990's—A New Approach to an Old Problem,*" and because

12. As Judge Gertner has pointed out, "the fair cross-section theory as we understand it cannot be explicitly found in the Constitution" because "[a]t the time of its drafting, juries consisted of white, male, and propertied citizens." *United States v. Green,* 389 F.Supp.2d 29, 51 n. 40 (D.Mass.2005), *overruled on other grounds by In re United States,* 426 F.3d 1 (1st Cir.2005).

13. The Commonwealth conceded that Hispanics were a "distinctive group" in Essex County. *Arriaga,* 438 Mass. at 563, 781 N.E.2d 1253.

14. Among other things, Petitioner and his co-defendant also submitted the undergraduate study supervised by Professor Sutton.

"more than two-thirds of Hispanic individuals living in the United States have a surname appearing on that list," Petitioner calculated that "no more than five of the 342 prospective jurors identified by surname, or 1.46 [percent], were Hispanic." *Id.*[15]

The *Arriaga* court found this evidence insufficient to satisfy the second *Duren* element since the disparity between Hispanics in the venire and Hispanics in Essex was not substantial under the "absolute disparity test."[16] In reaching this conclusion, the SJC declined Petitioner's request to forgo an absolute disparity analysis and instead apply a "comparative disparity" or "disparity of risk" test. *See id.* at 565–67, 781 N.E.2d 1253.

In *United States v. Royal,* 174 F.3d 1 (1st Cir.1999), the First Circuit explained that:

> [a]bsolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members [i]n the jury [venire].... In contrast, comparative disparity measures the diminished likelihood that members of an underrepresented

group, when compared to the population as a whole, will be called for jury service.... It is calculated by dividing the absolute disparity percentage by the percentage of the group in the population.

*Id.* at 6–7 (internal quotation marks and citations omitted).

Disparity of risk, the third method at issue, "describes the increase in a defendant's chance of drawing an underrepresentative petit jury as a result of an underrepresentative jury pool. It measures the likelihood of having at least one [member of a distinctive group] in a given ... jury." *United States v. Green,* 389 F.Supp.2d 29, 53 (D.Mass.2005), *overruled on other grounds by In re United States,* 426 F.3d 1 (1st Cir.2005). Although this test was proposed by a commentator in 1994, *see* Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel,* 103 Yale L.J.1913 (1994), it had not been applied in a state or federal case prior to the *Arriaga* court's decision.

As the SJC correctly noted, "the majority of jurisdictions," including the First Circuit, "apply the absolute disparity test."

---

**15.** According to the study supervised by Professor Sutton, Hispanics represented a slightly larger percentage of Essex County residents summoned for jury duty between July 1, 1993 and September 17, 1993. (*See* R.App. of Appellant Arriaga on Appeal to SJC 152, 156.)

**16.** The SJC also found that Petitioner was not entitled to use a surname analysis to identify Hispanic jurors. *See Arriaga,* 438 Mass. at 563–64, 781 N.E.2d 1253 (citing *Commonwealth v. Fryar,* 425 Mass. 237, 242, 680 N.E.2d 901 (1997); *Commonwealth v. Colon,* 408 Mass. 419, 438 n. 11, 558 N.E.2d 974 (1990); *Alen v. State,* 596 So.2d 1083, 1093 (Fla.Dist.Ct.App.1992) (Gersten, J., concurring)). Because this determination is contrary to the Supreme Court's decisions in *Hernandez v. Texas,* 347 U.S. 475, 480 n. 12, 74 S.Ct. 667, 98 L.Ed. 866 (1954) and *Cas-*

*taneda v. Partida,* 430 U.S. 482, 486–87, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), it cannot serve as a basis upon which to deny *habeas* relief.

In addition, the SJC held that "[t]he single venire brought into the court room for the defendants' trial [wa]s an unacceptably small sample for the purpose of any statistical showing of underrepresentation." 438 Mass. at 564, 781 N.E.2d 1253 (citation omitted). Since the state courts refused to afford Petitioner access to Jury Commissioner records, it would be unfair for this court to penalize Petitioner for the size of the sample he presented. *Cf. United States v. Jackman,* 46 F.3d 1240, 1245–48 (2d Cir.1995) (analyzing underrepresentation of Blacks and Hispanics on appellant's venire under comparable circumstances).

*Arriaga*, 438 Mass. at 565, 781 N.E.2d 1253 (citing *Duren*, 439 U.S. at 364–366, 99 S.Ct. 664; *Castaneda v. Partida*, 430 U.S. 482, 495–496, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *United States v. Williams*, 264 F.3d 561, 568–569 & n. 4 (5th Cir.2001); *Royal*, 174 F.3d at 6–11; *United States v. Rogers*, 73 F.3d 774, 775–777 (8th Cir. 1996); *United States v. Sanchez–Lopez*, 879 F.2d 541, 547 (9th Cir.1989)).

In these jurisdictions, courts generally regard a disparity below 10% as insubstantial. *See, e.g., United States v. Joost*, 94 F.3d 640, 1996 WL 480215 (1st Cir.1996) (table) (absolute disparity of 7.13% found permissible), *cert. denied*, 519 U.S. 974, 117 S.Ct. 408, 136 L.Ed.2d 321 (1996); *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir.1990) (4.7% absolute disparity found permissible), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991); *United States v. Hawkins*, 661 F.2d 436, 442 (5th Cir.1981) (absolute disparity of 5.45% found permissible), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); *United States v. McAnderson*, 914 F.2d 934, 941 (7th Cir. 1990) (absolute disparity of 8% found permissible), *cert. denied*, 513 U.S. 953, 115 S.Ct. 372, 130 L.Ed.2d 323 (1994); *United States v. Clifford*, 640 F.2d 150, 155 (8th Cir.1981) (absolute disparity of 7.2% found permissible); *United States v. Suttiswad*, 696 F.2d 645, 648–49 (9th Cir.1982) (absolute disparities of 2.8% for Blacks, 7.7% for Hispanics, and 4.7% for Asians found permissible); *United States v. Gault*, 141 F.3d 1399, 1402–03 (10th Cir.1998) (absolute disparity of 7% found permissible), *cert. denied*, 525 U.S. 910, 119 S.Ct. 253, 142 L.Ed.2d 208 (1998); *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir.1984) (absolute disparity of 7.6% found permissible).

Despite its wide use, the absolute disparity test has been the subject of a great deal of criticism on both "statistical" and "logical grounds." *Royal*, 174 F.3d at 10.[17] As the SJC itself acknowledged, this mode of analysis may "too [readily] tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing." *Arriaga*, 438 Mass. at 566, 781 N.E.2d 1253 (quoting *Biaggi*, 909 F.2d at 678).

A myopic focus on absolute disparity is particularly dangerous in a case such as this where, because of the small number of Hispanics in Essex County, even their complete exclusion would have resulted in an absolute disparity of less than 10%.[18] Consequently, some courts ascribe "limited value" to absolute disparities "when considering small populations." *United States*

---

**17.** In addition, there is good reason to suspect that the "10% rule" is "based on faulty precedent." *Green*, 389 F.Supp.2d at 55 n. 52. The source of this rule is *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), an equal protection challenge where "[t]he petitioners had to prove *purposeful discrimination* against blacks in their participation as jurors." *Waller v. Butkovich*, 593 F.Supp. 942, 954 (M.D.N.C.1984) (emphasis added).

Because "intentional discrimination ... is not an element of a Sixth Amendment fair cross-section challenge," *Royal*, 174 F.3d at 6

n. 2, "[w]hether a fair cross section exists is entirely different from whether intentional discrimination occurred," *Waller*, 593 F.Supp. at 954.

**18.** It bears noting that the *Arriaga* court refused to rule out the possibility that a disparity smaller than 10 percent could "support a conclusion of unconstitutional underrepresentation of smaller minority groups, especially when coupled with persuasive evidence of systematic exclusion." 438 Mass. at 566, 781 N.E.2d 1253 ("[W]e do not apply the absolute disparity test mechanically....").

*v. Chanthadara*, 230 F.3d 1237, 1256 (10th Cir.2000), *cert. denied*, 534 U.S. 992, 122 S.Ct. 457, 151 L.Ed.2d 376 (2001); *see also United States v. Rogers*, 73 F.3d 774, 776–77 (8th Cir.1996) ("Although utilizing the absolute disparity calculation may seem intuitive, its result understates the systematic representative deficiencies; the percentage disparity can never exceed the percentage of [the distinctive group] in the community."), *cert. denied*, 517 U.S. 1239, 116 S.Ct. 1889, 135 L.Ed.2d 183 (1996); *Jefferson v. Terry*, 490 F.Supp.2d 1261, 1284 (N.D.Ga.2007).[19]

Of course, the fact that the absolute disparity approach leaves a good deal to be desired does not mean that its use by the SJC constituted an unreasonable application of clearly established federal law. On the contrary, in applying this test, the SJC acted in accordance with the majority of circuit courts, as well as the *Duren* Court itself. *See* 439 U.S. at 365–66, 99 S.Ct. 664 (finding an absolute disparity of 39% indicative of Sixth Amendment violation).

Petitioner attempts to downplay the significance of the Supreme Court's reliance on absolute disparity in *Duren* by pointing out that nothing in the decision can be read as barring *any* method which might aid a court in determining whether a distinctive group's representation was "fair and reasonable." While Petitioner is correct in noting that "[n]o methodology has been mandated by the Supreme Court," *Green*, 389 F. Supp 2d at 54, the absence

of clearly established federal law, as determined by the Supreme Court, hardly helps his case.

In light of the SJC's objectively reasonable reliance on the absolute disparity test, the question becomes whether the Commonwealth's highest court was objectively unreasonable in finding an absolute disparity of 4.04% insufficient to satisfy the second *Duren* element. As previously noted, numerous circuit courts, including the First Circuit, have found equal or greater disparities incapable of supporting a fair cross section claim. *See, e.g., Joost*, 94 F.3d at 640, 1996 WL 480215 at *1. This authority confirms that the SJC's approach, whatever Petitioner's expert might say, simply was not unreasonable. For this reason, the court allowed Respondent's motion to dismiss with respect to Petitioner's fair cross section claim.[20]

### B. *Ground Two.*

As noted above, Petitioner asserts that state court violations of his constitutional rights to equal protection, due process, and access to the courts entitle him to *habeas* relief. It is well-settled that cases involving the treatment of indigent appellants "reflect both equal protection and due process concerns." *M.L.B. v. S.L.J.*, 519 U.S. 102, 120, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (citation omitted); *see also Lewis v. Casey*, 518 U.S. 343, 367, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (Thomas, J., concurring) (noting that the right of access to

---

**19.** That being said, applying the comparative disparity mode of analysis in a case involving a small minority population runs the risk of "distort[ing] reality." *United States v. Hafen*, 726 F.2d 21, 24 (1st Cir.1984) (citation omitted).

> For example, in an area that had 500,000 whites and only one black eligible to serve as jurors, a random selection system that failed to place the single black on the master wheel would produce a 100 per cent

> comparative disparity, even though an all-white jury would clearly form a 'fair cross section' of the community.
> *Id.*

**20.** Given Petitioner's inability to satisfy the second *Duren* prong, the court need not discuss the SJC's findings with respect to the third *Duren* element. *See Royal*, 174 F.3d at 11 (deciding the case under *Duren's* second prong).

the courts has been described as "a 'consequence' of due process, ... an 'aspect' of equal protection, ... or as an 'equal protection guarantee'" (citations omitted)).[21]

Generally, courts "analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause" and address "the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." *Bearden v. Georgia*, 461 U.S. 660, 665, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983) (citation omitted). "[A]s a practical matter," however, "the two clauses largely converge." *Smith v. Robbins*, 528 U.S. 259, 276, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (citation omitted).

While neither provision requires states to provide appellate review, *see Ross v. Moffitt*, 417 U.S. 600, 606, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) (citing *McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 38 L.Ed. 867 (1894)), the decision to make such review available triggers an obligation to furnish procedures which "offer each defendant a fair opportunity to obtain an adjudication on the merits of his appeal," *Evitts v. Lucey*, 469 U.S. 387, 405, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (discussing *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963)).

To implement this principle of fundamental fairness, the Supreme Court has "focused on identifying the basic tools of an adequate defense or appeal, and ...

ha[s] required that such tools be provided to those defendants who cannot afford to pay for them." *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (internal quotation marks and citation omitted).

Petitioner contends that the SJC denied him one such tool by failing to collect data recording the racial or ethnic identity of prospective jurors. In support of this argument, he points to the *Arriaga* court's concession that asking potential jurors to "voluntarily ... disclose their racial and ethnic background in the juror confirmation form" had not produced the information necessary to "assess the issue of underrepresentation." 438 Mass. at 571, 781 N.E.2d 1253. According to Petitioner, by subsequently ordering the Jury Commissioner to adopt the approach taken by federal courts, *see* 28 U.S.C. § 1869(h) (requiring prospective jurors to identify themselves by race in order "to enforce nondiscrimination in jury selection"),[22] the SJC essentially acknowledged a deprivation of his right to due process.

The problem with this contention stems from the lack of any Supreme Court case law suggesting that state officials have an obligation under the Fourteenth Amendment to the United States Constitution to collect or record the racial and ethnic makeup of the source bodies from which petit juries are drawn. Given the absence of any such authority, the SJC's efforts to address a perceived "gap in the court's own gathering of information," *id.* at 572, 781 N.E.2d 1253, cannot serve as a basis upon which to grant *habeas* relief.

---

**21.** The Supreme Court has also "grounded the right of access to courts in the Article IV Privileges and Immunities Clause" and "the First Amendment Petition Clause." *Christopher v. Harbury*, 536 U.S. 403, 415 n. 12, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (citations omitted).

**22.** Like the United States District Court for the District of Massachusetts, the Commonwealth now requires prospective jurors to identify themselves by ethnicity, as well as race. *See Arriaga*, 438 Mass. at 572, 781 N.E.2d 1253.

Petitioner next contends that the state courts ignored their constitutional obligation to provide him with funds to hire an expert. Because Petitioner requested financial assistance in connection with his motion for a new trial and indigent defendants in Massachusetts are only entitled to "extra fees" when pursuing an "appeal," *see* Mass. Gen. Laws ch. 261, § 27C(4), Respondent asserts that the trial judge and SJC correctly applied state law in refusing to provide Petitioner funds to hire Professor Sutton.[23]

Assuming *arguendo* that the timing of Petitioner's motion for a new trial rendered it the functional equivalent of a first tier appeal, this is not one of those rare instances where "a state court's error in applying a state rule ... ha[s] constitutional implications." *Sanna v. Dipaolo*, 265 F.3d 1, 12 (1st Cir.2001) (citation omitted).

▆ Pursuant to AEDPA, Petitioner must demonstrate that the state courts' refusal to pay for a demographer was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. While the principle of "equal justice" first set forth in *Griffin* has been applied in an assortment of contexts, *see, e.g., Douglas*, 372 U.S. at 357–58, 83 S.Ct. 814 (requiring appointment of counsel for first appeal as of right); *Smith v. Bennett*, 365 U.S. 708, 713–14, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961) (ruling that state must waive filing fee for

indigent *habeas* applicants),[24] the Supreme Court has never required a state to provide non-psychiatric expert assistance to a defendant pursuing an appeal.[25]

▆ On the contrary, the Court has proclaimed consistently that

> The duty of the State ... is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.

*Coleman v. Thompson*, 501 U.S. 722, 756, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (quoting *Ross*, 417 U.S. at 616, 94 S.Ct. 2437). Accordingly, the court must conclude that the Commonwealth had no Fourteenth Amendment obligation to pay for the services of Professor Sutton or to accept Petitioner's preliminary data as reliable for the purpose of ruling on his posttrial motions for funds.

The state courts' denial of Petitioner's discovery requests presents another story. While the SJC found that Mass. Gen. Laws chapter 234A, §§ 10, 15 provided Petitioner with "access to basic information from which [he] could proceed to discover the ethnic identity of the prospective jurors," *Arriaga*, 438 Mass. at 572, 781 N.E.2d 1253, Petitioner has rebutted this factual determination with clear and con-

---

**23.** After the trial judge denied Petitioner's motion for a new trial, "the SJC amended Mass. R.Crim. P. 30(c)(5) to authorize the allowance of costs associated with new trial motions." *Murphy v. Dennehy*, No. 05–12246–DPW, 2007 WL 430754, at *6 (D.Mass. Feb.5, 2007).

**24.** *Griffin* itself invalidated a state practice of limiting appellate review to persons able to afford a trial transcript. *See* 351 U.S. at 18–19, 76 S.Ct. 585

**25.** Recently, the Supreme Court held that a state prisoner facing a death sentence who had "made a substantial showing of incompetency" was entitled to "adequate means by which to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court." *Panetti v. Quarterman*, —— U.S. ——, ——, 127 S.Ct. 2842, 2855, —— L.Ed.2d ——, —— (2007).

vincing evidence that the Jury Commissioner refused to recognize his statutory right to the names of prospective Essex County jurors.

■ Under the circumstances, Petitioner asserts that this information constituted the only tool with which he could construct a viable fair cross section challenge. *See Lewis*, 518 U.S. at 355, 116 S.Ct. 2174 ("The tools [which must] be provided are those that the inmates need in order to attack their sentences, directly or collaterally ...." (citing *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977))).

In order to prove that the denial of access to this data violated his right of meaningful access to the courts, Petitioner must demonstrate "actual injury," which the Supreme Court has defined as "a nonfrivolous legal claim [being] frustrated or ... impeded." *Id.* at 349, 353, 116 S.Ct. 2174; *see also Boivin v. Black*, 225 F.3d 36, 43 n. 2 (1st Cir.2000).

While the Jury Commissioner's refusal to recognize Petitioner's rights under Chapter 234A clearly hampered the effort to "produce reliable data concerning [the] 'ordinary and regular composition of jury venires in Essex County,'" *Arriaga*, 438 Mass. at 564, 781 N.E.2d 1253 (quoting *Commonwealth v. Tolentino*, 422 Mass. 515, 520, 663 N.E.2d 846 (1996)), there is no evidence that the production of such data would have entitled Petitioner to any relief.

Conspicuously absent from the record is any expert or other report describing the nature of the opportunity Petitioner lost when he was denied access to the relevant data. Without any such evidence, the court cannot presume that this opportunity was significant, since the SJC's objectively reasonable application of the "ten percent" rule all but foreclosed a fair cross section claim. Indeed, because Hispanics com-prised only 5.5 percent of Essex County's adult population, it was mathematically impossible for Petitioner to prove that there were 10 percent more Hispanics residing in Essex County than there were on Essex County jury pools.

It is now clear that Petitioner's only hope of establishing a Sixth Amendment violation rested on convincing the SJC to abandon absolute disparity in favor of another analytical approach or producing persuasive evidence of systematic exclusion. In light of his inability to do either, the state courts' denial of Petitioner's discovery requests did not result in any cognizable harm.

As the Supreme Court has observed, the right of meaningful access to the courts does not exist in a vacuum but "is ancillary to the underlying claim." *Christopher v. Harbury*, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (footnote omitted). Hence, notwithstanding clear and convincing evidence that Petitioner was denied access to data intended to "insure the integrity of the juror selection process," Mass. Gen. Laws ch. 234A, § 15, Petitioner suffered no injury "by being shut out of court," *Christopher*, 536 U.S. at 415, 122 S.Ct. 2179.

### C. *Ground Four.*

Petitioner contends that the extremely generous disposition Mercado received in spite of her false testimony in the Morales trial is proof of a cooperation agreement with the Commonwealth that did not require her to testify truthfully. Because the Commonwealth failed to disclose this arrangement—and in fact informed Petitioner's jury that it would only consider Mercado's "truthful testimony ... in resolving the charge pending against her"— Petitioner maintains that he is entitled to *habeas* relief under *Kyles v. Whitley*, 514

U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

"[I]f such an agreement did exist," there is no question that the Commonwealth "would have been obligated to disclose it." *United States v. Tse,* 375 F.3d 148, 165 (1st Cir.2004) (citing *Giglio,* 405 U.S. at 154–55, 92 S.Ct. 763).[26] The only issue, then, is whether Commonwealth courts overlooked clear and convincing evidence of a clandestine agreement that would have violated both state and federal law, as well as the rules of professional responsibility.

▮ Petitioner posits that Mercado's false testimony during the Morales trial was a product of "the prosecutor's accepting response to Ms. Mercado's repeated, uncorrected false testimony in [Petitioner's] trial that she had no agreement with the Commonwealth in exchange for her testimony, no arrangement to plead guilty and no expectation of sentencing leniency." (Pet'r's Mem. in Opp'n to Resp't's Mot. to Dismiss 48.) This argument is tenuous at best. It is more likely that the strain of testifying against individuals who had threatened to harm her children caused Mercado to fall apart during the Morales trial.

The fact that she received a lenient sentence despite testifying inconsistently in the two trials does not mean that the Commonwealth misrepresented its understanding with her. As previously noted, the terms of the agreement presented to Petitioner's jury required the Commonwealth to take Mercado's "cooperation, including her truthful testimony, into consideration in resolving the charge pending against her." Although Petitioner contends that Mercado's cooperation was limited to the testimony she offered in the two trials, the record reflects that Mercado provided the Commonwealth with letters written by Petitioner and his co-defendant, which the trial judge deemed strong evidence of an orchestrated attempt to intimidate witnesses and influence their testimony.

This consciousness of guilt evidence not only bolstered the Commonwealth's case, it demonstrated a well-founded fear of reprisal which Mercado had to overcome in deciding to cooperate. Ample support exists for the inference that the Commonwealth considered the full extent of Mercado's cooperation, as well the risks associated with it, in recommending a sentence of time served.[27]

In sum, because the evidence of an undisclosed agreement between the Commonwealth and Mercado is neither clear nor convincing, the court allowed Respondent's motion to dismiss with respect to Ground Four.

### D. *Ground Five.*

Petitioner asserts that his trial attorney rendered constitutionally ineffective assistance in failing to properly document a fair cross section challenge or request funds to fully investigate the claim. In response to this claim, the SJC stated:

---

**26.** Respondent also appears to concede that the Commonwealth's failure to disclose a secret agreement with Mercado permitting her *to commit perjury with impunity* would have led to "a verdict [un]worthy of confidence." *United States v. Gonzalez–Gonzalez,* 258 F.3d 16, 22 (1st Cir.2001) (citing *Strickler v. Greene,* 527 U.S. 263, 298, 119 S.Ct. 1936,

144 L.Ed.2d 286 (1999) (Souter, J., concurring in part and dissenting in part)).

**27.** In contrast, it would be untenable to conclude that the Commonwealth had an undisclosed agreement to reward Mercado based on the results of the trials in question, since her testimony did not lead to the outcome the Commonwealth desired in the Morales case.

[T]he defendants each argue that their respective counsel rendered ineffective assistance in failing to preserve error and to pursue and develop the motions to dismiss the venire. Little is offered by either defendant to support these contentions. As discussed above, there is no basis for us to conclude that the claimed underrepresentation of Hispanics was substantial or resulted from systematic exclusion in the jury selection process. The defendants have not demonstrated that trial counsel erred in failing to pursue the motions to dismiss the venire and have not demonstrated a substantial likelihood of a miscarriage of justice.

*Arriaga,* 438 Mass. at 583, 781 N.E.2d 1253.

To prove a violation of the right to effective assistance of counsel a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "the deficient performance prejudiced his defense." *Owens v. United States,* 483 F.3d 48, 57 (1st Cir. 2007) (quoting *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

"Under the first prong of *Strickland,* there is a strong presumption that counsel's strategy and tactics fall within the range of reasonable professional assistance...." *Knight v. Spencer,* 447 F.3d 6, 15 (1st Cir.2006) (internal quotation marks and citation omitted). To satisfy the second *Strickland* prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Dugas v. Coplan,* 428 F.3d 317, 334 (1st Cir.2005) (defining "reasonable probability" as "a probability sufficient to undermine confidence in the outcome" (citation omitted)).

Given that any argument regarding underrepresentation of Hispanics in the jury venire would have been futile under the well supported view of the law taken by the SJC, Petitioner's claim of ineffective assistance of counsel on this ground is plainly flawed.

## V. CONCLUSION

For the reasons set forth above, the court allowed Respondent's motion to dismiss on March 19, 2007. The clerk is ordered to enter judgment for Respondent. This case may now be closed.

It is So Ordered.